581 A.2d 1300

**Charles T. KLINE**

v.

**Marlene A. KLINE.**

**No. 69, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Nov. 15, 1990.

Certiorari Denied March 22, 1991.

30

32

Natalie H. Rees, Baltimore, for appellant.

Richard D. Rosenthal (Joseph N. Karey, on the brief), Baltimore, for appellee.

Argued before MOYLAN, BLOOM and JAMES S. GETTY (Retired, Specially Assigned), JJ.

BLOOM, J.

### Preface

Although Maryland's Property Disposition in Annulment and Divorce Act (the Act)[1] has been the subject of extensive litigation since it became effective on 1 January 1979, some of its provisions continue to baffle and confuse bench and bar alike. One explanation for the confusion may lie in the fact that the Act gives artificial meanings to the noun "property" when it is modified by the adjective "marital" or its antithesis, "nonmarital." When a word has different meanings and connotations in various contexts, there may

---

1. Enacted as ch. 794 of the Laws of 1978 and now codified as Md.Code (1984) Family Law §§ 8–201 through 8–213 inclusive.

be a tendency to ascribe to it the most familiar meaning and connotation regardless of the context.[2]

This case, which comes to us on cross-appeals by both the husband, Charles T. Kline, and the wife, Marlene A. Kline, from a judgment of absolute divorce entered by the Circuit Court for Anne Arundel County, illustrates some of the more popular misconceptions concerning the Act and its application. Neither party objects to the severance of the matrimonial bonds; both, however, find fault with the remaining provisions of the judgment, which concern distribution of property and awards of alimony and counsel fees. Because several of their complaints are valid, we shall reverse various portions of the judgment relating to distribution of property and remand for reconsideration of those issues in light of this opinion. We shall affirm, however, the grant of an absolute divorce and some other provisions of the judgment as to which there is no dispute.

### Facts

There appears to be little disagreement as to any of the material facts. The parties have known each other for many years. Mr. Kline was a recent widower with three children, two of whom were emancipated, when he and Marlene Amland, a divorcee with an emancipated child of each of her two prior marriages, decided to marry. Each owned a home but neither wanted to live in the home of the other, so they sold their respective properties and together bought another house which they intended to be their marital home.

The new home, at 450 Mary Kay Place, in Linthicum,

---

**2.** Writing for this Court in *Glenn v. State,* 68 Md.App. 379, 511 A.2d 1110 *cert. denied,* 307 Md. 599, 516 A.2d 569 (1986), Judge Moylan noted a similar phenomenon with respect to the word "malice" in the context of homicide law. During the development of the law, "malice" had taken on various meanings and, as a result, confusion arose because of the tendency to ascribe one meaning when the legal proposition at hand called for another.

Maryland, was purchased for $94,150.[3] Mr. Kline contributed $69,000 from the sale of his house; Mrs. Amland contributed either $10,000 or $8,000 from the sale of her house;[4] and there was a purchase money mortgage of $20,750 payable over thirty years. Settlement was conducted on 3 May 1985, at which time the property was conveyed to Charles T. Kline and Marlene A. Amland as joint tenants with rights of survivorship. Three weeks later, on May 25, the parties were married. Thereafter, in August 1985, they changed the form of their co-ownership of the Linthicum property from joint tenancy to tenancy by the entireties.

Several months after the parties married they purchased a business, which they named "B & M Video."[5] They paid $48,000 for the business, $28,000 of which was contributed by Mr. Kline out of proceeds of insurance on the life of his first wife. The remaining $20,000 was part of an initial advance of $24,000 from Household Finance Corporation III, which took a deed of trust on their home to secure a total loan of $45,000 or so much thereof as the parties actually drew. Sometime later, Mr. Kline borrowed $4,000 from his sister, Lavinia Adler, to purchase more inventory for the business.

The joys of marriage were short-lived. The husband blamed the deterioration of the marriage on the presence, from time to time, of the wife's daughter, who, according to him, had a serious drug problem; the wife's mother, who was ill; and the husband's daughters, who were a source of strife and trouble. Whatever the reason, after just 18 months of marriage the parties separated. The husband alleged the separation was by mutual agreement; the wife

---

**3.** With closing costs, prepaid taxes, escrow, and fees, the total paid by the purchasers at settlement was $99,753.24.

**4.** Mrs. Kline furnished conflicting information on this point. The court found that she contributed $8,000. Based on the total amount required at settlement, $10,000 was more likely correct. As will be explained, *infra*, the amount is immaterial.

**5.** For Butch (Mr. Kline's nickname) and Marlene.

alleged that the husband constructively deserted her. In either event, the parties divided up their personal property and the wife moved out of the home. Thereafter, the husband changed the locks in order, he said, to keep the wife's daughter from returning. The wife made no effort to return to the house and never asserted a right to do so.

### The Circuit Court's Decision

On the basis of the evidence presented, the court found that the house had a current market value of $110,000 with a first mortgage balance of $20,000 and with a second lien held by Household Finance in the amount of $44,000, the husband having borrowed an additional $20,000, of which part was spent for joint obligations and part was spent for his sole benefit, including $7,000 for attorneys' fees. The business has a current value of $22,000, but against that value are the unpaid $4,000 debt to the husband's sister and $20,000 of the unpaid $44,000 loan from Household Finance.

As a result of a pretrial motion and hearing, a counsel fee of $250, payable to the husband, was assessed against the wife for failure to disclose, during discovery proceedings, information pertaining to her pension. That award was nullified by the trial judge, who, as part of the divorce judgment, awarded the wife a counsel fee of $1,000 while striking out the $250 previously assessed against her. The court also awarded alimony of $25.00 per month for one year. The husband protests the awards of alimony and counsel fees and the striking out of counsel fees originally awarded to him. The principal problems with the judgment, however, lie in those portions of it which deal with characterization and disposition of property. The court determined that both the home and the business were marital property, the home by virtue of gifts by husband to wife of $69,000 and wife to husband of $8,000 of their respective nonmarital funds. By way of "adjustment of the equities and rights of the parties concerning marital property," the court ordered that both the house and the business be sold with the proceeds divided as follows:

The mortgage balance on the marital home in the amount of approximately $20,000, the equity loan owed to Household Finance in the amount of approximately $44,000, the loan to Levinia [sic] Adler in the amount of $4,000, and the $28,000 owed to the Plaintiff [husband] for his non-marital contribution to B & M Video are to be paid. The remaining balance is to be divided equally between the parties with the following adjustments: The Plaintiff will receive a debit of $7,000 for the portion of the equity loan which was applied to his attorney fees; the Defendant will receive a credit of $7,000 for the same; the Plaintiff will receive a credit of $6,500 for his *Crawford* contributions [6] for the maintenance of the marital home from the date of the separation of the parties until the date of the hearing; the defendant will receive a $6,500 debit for same; the Plaintiff will receive a debit of $6,500 for the balance of the equity loan which he retained for his personal use; and, the Defendant will receive a $6,500 credit for same.

### Errors in the Judgment

### (and Errors in Assertions of Error)

The husband is correct in his contention that the court erred in characterizing the house as marital property, but his belief that he is entitled to recoup his $69,000 initial contribution is erroneous for two reasons, both of which are based upon misconceptions about the Act.

The wife is correct in her assertion that the court erred in awarding the husband $28,000 out of the proceeds of sale of the house and business.

---

6. Money paid to purchase, improve, or protect property, such as mortgage principal, interest, taxes, insurance, and necessary repairs. *Crawford v. Crawford*, 293 Md. 307, 443 A.2d 599 (1982), held that the general law of contribution between co-tenants applies to property owned by spouses as tenants by entireties, except that such payments, while the parties are living together, are presumed to be gifts. There is no presumption of gift after the parties cease living together as husband and wife.

The husband's complaint that the court erred in granting the wife a monetary award is totally lacking in merit for a variety of reasons, not least of which is the fact that the court made no monetary award in favor of the wife. What the court did, in effect, was to award each party sums of money, to be paid out of the proceeds of sale of their jointly owned property, as an adjustment of specific equitable claims. Nevertheless, the judgment, in that respect, is worded in such a way—that one party will receive a credit and the other a debit as a result of a particular claim—as to double the amount intended to be awarded on each claim. One of those awards, for "*Crawford* contributions" is objected to by the wife as being inconsistent with a finding of ouster by the court. We do not believe the court so found; more importantly, we perceive nothing in the record that would support such a finding had it been made.

# I

The court determined that the parties' home in Linthicum was marital property by virtue of the husband's gift of $69,000 in nonmarital funds to the wife and the wife's gift of $8,000 nonmarital funds to the husband when the home was purchased. That determination was clearly erroneous.

■ "Marital property" within the meaning of the Act is defined in § 8–201(e)(1) as "property, however titled, acquired by 1 or both parties during the marriage." Property acquired prior to the marriage, therefore, is by definition not marital property. That point is emphasized by § 8–201(e)(2)(i), which very specifically declares that marital property does not include property acquired before the marriage.

■ The parties jointly acquired their property in Linthicum before they were married, taking title as joint tenants with rights of survivorship. The subsequent change in the form of their co-ownership from a joint tenancy to a tenancy by the entireties—from *per my et per tout* [7] to *per tout*

---

7. By the half and by the whole.

*et non per my* [8]—was not an acquisition of property by either spouse. They jointly owned the whole property with right of survivorship both before and after the change in the form of their co-tenancy.

 It is well established that property may be partly marital and partly nonmarital, in accordance with the source of the funds used to acquire it. The Linthicum property, therefore, became partly marital by virtue of mortgage payments made during the marriage because, to the extent that such payments reduced the balance due on the mortgage, property was acquired during the marriage. *See Harper v. Harper,* 294 Md. 54, 448 A.2d 916 (1982). The record in this case discloses that the mortgage, executed less than a month before the marriage, was for $20,750. The court found, on the basis of the husband's testimony, that the mortgage balance had been reduced to $20,000 at the time of the divorce. Since all mortgage payments were made during the marriage, the Linthicum property was marital to the extent of the $750 marital contribution to its acquisition. When, in accordance with *Harper,* we apportion the current value of the property between the marital contribution ($750) and the nonmarital contributions (measuring the value of the joint contribution by the value of the property contributed as indicated by the purchase price) it is readily apparent that for purposes of a monetary award (the only real reason under the Act for determining and valuing marital property, § 8–205), the marital property is *de minimus.*

## II

We turn now to the husband's contention that since the Linthicum property is nonmarital (or almost entirely so) he is entitled to a return of his $69,000 nonmarital contribution. This contention is based on two fallacies: (a) that he made a $69,000 nonmarital contribution and (b) that one

---

**8.** By the whole and not by the half.

who makes a nonmarital contribution to the acquisition of property is entitled to a return of the amount contributed.

(a)

The first of those fallacies appears to be based on a misreading of *Grant v. Zich*, 300 Md. 256, 477 A.2d 1163 (1984) and *Watson v. Watson*, 77 Md.App. 622, 551 A.2d 505 (1989). In *Grant*, the Court of Appeals held that the presumption of gift that arises from the conveyance of one spouse to another has no applicability to the determination of whether property is marital or nonmarital. *Dorsey v. Dorsey*, 302 Md. 312, 487 A.2d 1181 (1985), recognized the possibility of proving a gift of the marital status of property as well as the property itself. In *Watson*, however, we explained that a gift of property, whether proved by presumption, by testimony as to expression of intent, or by documents conclusively establishing donative intent, does not transmute the status of that property, for purposes of the Act, from nonmarital to marital. To effect such transmutation, we pointed out, there must be an express intent to give up, waive, or surrender the nonmarital status as well as to give the property itself.

The difficulty with the concept lies, perhaps, in the traditional meaning of the word "property." "Property" normally connotes corporeal, tangible property, subject to dominion—a thing, whether real estate or chattel, that can be owned (and thus bought, sold, given away, or otherwise transferred), possessed, and used. The law, of course, also recognizes intangible and incorporeal property, including such personalty as choses in action, patents, and copyrights, and such incorporeal interests or estates in realty as easements, licenses, and profits. But even intangible or incorporeal property traditionally connotes ownership, possession, and use, with all the rights and privileges normally associated therewith.

When, for purposes of the Act, however, we designate property as marital or nonmarital, we are using words which have no relationship to traditional concepts of proper-

ty. Whether property is marital or nonmarital has nothing whatsoever to do with who owns it, possesses it, or uses it. The very concepts of marital and nonmarital property arise only in the context of a marriage, and they have significance only in the event of and at the time of a judicial dissolution of the marriage relationship. The sole purpose of determining whether property is marital or nonmarital is to enable a divorce court to adjust equities arising out of the marriage relationship by awarding one party or the other a sum of money if a division of property according to ownership would be inequitable. "Marital" and "nonmarital" are adjectives descriptive not of ownership or other rights in property but merely of the time or manner of acquisition by either or both spouses.

If instead of "marital" and "nonmarital" we could substitute other adjectives, such as "red" and "green," the concept would be easier to grasp: a gift by one spouse to the other of a green chattel will effect a change of ownership, not of color; the chattel would still be green, unless the parties, by agreement, changed the color or at least agreed that as between themselves they would deem the chattel to be red. But just as a change of ownership has no effect on the color, a change of color would have no effect on the ownership.

When the parties in this case pooled their money to purchase the Linthicum property, they gave to each other undivided ownership interests in property that was neither red nor green, neither marital nor nonmarital, for prior to their marriage those concepts did not exist. The mutual gifts were of *all* rights of property, legal and equitable, which each donor had. Unlike the situation in *Watson*, where the gift was made, during the marriage, of property that by virtue of marriage had acquired a nonmarital status, here there was no nonmarital status to be either retained or given, waived, released, or surrendered at the time of the gift. When they married, three weeks later, the parties jointly owned the property; therefore, they were equal joint nonmarital contributors of the entire property.

(b)

 The second fallacy, the mistaken belief that a contribution of nonmarital property somehow entitles the contributor to get back the property or its value, as if the contribution is deemed to create an indebtedness for which the contributor should have a lien, is a total distortion of the Act. As we pointed out in *Watson,* when one makes a valid gift of property, whether that property is red or green, marital or nonmarital, the donee acquires a vested interest in the property. The court, when it grants a divorce, cannot return to the grantor spouse the legal interest that he or she had earlier given just because the gift was of nonmarital property; to do so would violate § 8–202(a)(3) of the Act, which expressly prohibits the divorce court from transferring ownership of property, real or personal, from one spouse to the other. *Watson,* 77 Md.App. at 631, 632, 551 A.2d 505. *See also Rogers v. Rogers,* 80 Md.App. 575, 586, 565 A.2d 361 (1989); *Nisos v. Nisos,* 60 Md.App. 368, 380–81, 483 A.2d 97 (1984). The fact of the gift, the value of the property given, and the circumstances under which the gift was made are important factors to be considered by the court in determining whether to grant the donor spouse a monetary award to adjust equities between the parties, provided there is sufficient marital property to support such an award. *Watson,* 77 Md. at 638 n. 5, 551 A.2d 505.

## III

The husband contends that the court erred in determining the value of marital property when the amount of the marital debts exceeded the value of the marital property. Those contentions are partially correct.

 "Marital debt," like "marital property" and "nonmarital property," is a term that seems to invite confusion. "Debt," like "property," is a word quite familiar to almost everyone who can read, speak, or understand English. The most familiar connotations of "marital debt," however, are (1) a debt incurred by husband and wife jointly

or (2) a debt incurred by either spouse for any marital purpose. Within the purview of the Act, however, the phrase has an artificial meaning at variance with these familiar connotations. A marital debt is a debt incurred to acquire marital property. *Schweizer v. Schweizer,* 301 Md. 626, 636, 484 A.2d 267 (1984). As with "marital property" or "nonmarital property," this concept arises only as an incident of marriage and is significant only if and when there is a judicial dissolution of the marital relationship. The sole purpose of applying the concept of "marital debt" is to diminish the value of marital property, on the theory that to the extent it is encumbered by debt marital property has not been acquired within the contemplation of the Act. *See Zandford v. Wiens,* 314 Md. 102, 549 A.2d 13 (1988); *Niroo v. Niroo,* 313 Md. 226, 545 A.2d 35 (1988); *Schweizer v. Schweizer, supra,* 301 Md. at 637, 484 A.2d 267. Who owes the debt is as immaterial as who owns the property. And the debt need not be a lien or encumbrance on the property; it is sufficient that there is a debt outstanding and that it was incurred to acquire the property. Finally, marital debt cannot be transferred from one item of marital property to another. If the marital debt exceeds the value of the marital property acquired as a result of incurring the debt, the result is a zero value for the marital property so acquired; marital property cannot have a negative value. *See Green v. Green,* 64 Md.App. 122, 146–47, 494 A.2d 721 (1985).

The husband is entirely correct in contending that the business, B & M Video, had no value as marital property. The court found that the business had a total value, as of the time of divorce, of $22,000. That finding, being supported by uncontested expert testimony, is not clearly erroneous. But there is an outstanding debt of $4,000 to the husband's sister that was incurred in acquiring the business, and there is an outstanding debt to Household Finance Corporation III in the amount of $44,000 of which $20,000 was incurred to acquire the business. Neither of those debts constitutes a lien against the business assets.

On the contrary, the $20,000 marital debt is part of a larger debt constituting a lien against the house. Those facts are immaterial; there are existing marital debts in the amount of $24,000 that were incurred in the acquisition of property, now valued at $22,000, which is partly marital and partly nonmarital. Since the marital debts exceed the value of the marital property, B & M Video has zero value as marital property.

■ The husband's contention that the house in Linthicum has no value as marital property is *almost* correct, since the marital portion has minimal value. The contention, nevertheless, is based on the erroneous assumption that his initial $69,000 contribution and the wife's initial $8,000 contribution to the acquisition of the property as well as the $20,000 mortgage balance and the second trust balance of $44,000 owed to Household Finance must be subtracted from the $110,000 value of the property, leaving a marital value of minus $31,000. That contention defies explanation; it is totally at variance with every concept of determining and valuing marital property.

Initially, as we have pointed out *supra*, the parties jointly contributed to the marriage the full value of their jointly owned real estate. The property so contributed was nonmarital. Mortgage payments made during the marriage reduced the mortgage balance by $750. That $750 constituted a marital contribution to the acquisition of the property. It is of such an insignificant amount, however, that a monetary award based on it could hardly serve to adjust any inequities that the court might believe would result from the equal division of the net proceeds of sale of the property that is mandated by each party's ownership of a half interest in it.

The husband's next assertion, therefore, that the court erred in granting a monetary award to effect an equitable distribution of the property, would be correct if that is what the court had done. We do not read the judgment in this case as adjusting equities pursuant to the Act, unless the

payment to the husband of $28,000 "owed to [him] for his non-marital contributions to B & M Video" out of the proceeds of the sale of the house and business is so construed, and the husband can hardly be complaining of that decision in his favor.

██ The wife, however, does contend that the return to the husband of his $28,000 nonmarital contribution to the business was error, and with that contention we agree. Allowing the husband to recoup this sum was based upon the misconception to which we referred, *supra,* that a nonmarital contribution somehow creates an indebtedness or a lien. When the husband put $28,000 of his own money into the acquisition of the parties' business assets, he made a nonmarital contribution of that amount to acquire the property. Since this contribution was toward the purchase of a business to be owned by both spouses, there is a presumption of gift as to the property itself, but not a transmutation of the nonmarital status thereof. *Grant v. Zich, supra; Watson v. Watson, supra.* No evidence was presented to rebut that presumption. The fact that the gift was of property that can be designated nonmarital does not entitle the husband to a refund. Had there been any marital property to support a monetary award, the court might have granted such an award, but that is the extent of the court's authority, under the Act, to adjust equities.

### IV

The "adjustments" made by the court in the form of monies payable out of the proceeds of sale of jointly owned assets, for *Crawford* contributions and sums borrowed from Household Finance on the parties' joint credit but spent by the husband for his sole benefit, are based on equitable principles having no relationship to the Act.

### (a)

In *Hogan v. McMahon,* 115 Md. 195, 80 A. 695 (1911), the Court of Appeals held that one co-tenant who has made mortgage payments on the jointly owned property or who

has expended money for necessary repairs or improvements with the assent of the other is entitled to contribution, and equity will not only give him a claim for contribution but also create a lien as security for such demand. In *Schilbach v. Schilbach*, 171 Md. 405, 408, 189 A. 432 (1937), the Court held that *Hogan* is equally applicable to tenants by the entireties. *Colburn v. Colburn*, 265 Md. 468, 290 A.2d 480 (1972), extended the right of contribution to moneys spent for insurance premiums and taxes. Indeed, the Court made it clear that contribution may be demanded for any expenditures that were reasonable and necessary for the preservation and protection of the property against loss. The doctrine was more recently repeated in *Crawford v. Crawford*, 293 Md. 307, 443 A.2d 599 (1982), from which the term *"Crawford* contributions" is derived.

Although the right of a co-tenant to contribution for mortgage payments, including principal and interest, and insurance and taxes paid to protect and preserve the property is well established, we have held that by virtue of the Act a chancellor is not obliged to award such contribution between husband and wife at the time of a divorce. *See Broseus v. Broseus*, 82 Md.App. 183, 570 A.2d 874 (1990); *Wassif v. Wassif*, 77 Md.App. 750, 551 A.2d 935, *cert. denied*, 315 Md. 692, 556 A.2d 674 (1989); *Prahinski v. Prahinski*, 75 Md.App. 113, 540 A.2d 833, *cert. granted*, 313 Md. 572, 546 A.2d 490 (1988); *Spessard v. Spessard*, 64 Md.App. 83, 494 A.2d 701 (1985). We indicated in *Prahinski* that this was because the payments were made with marital funds. 75 Md.App. at 141, 540 A.2d 833. We did not intend our statement to that effect to be taken as meaning that an award of contribution would be required if the payor could show that the payments were made with nonmarital funds. The reason contribution is not mandatory between spouses at the time of divorce is that contribution is an equitable principle, as pointed out in *Hogan v. McMahon, supra,* and the ability to grant a monetary award under the Act enables the chancellor to achieve more

complete equity than can be done through a *Crawford* contribution.

Under *Hogan, Schilbach, Colburn,* and *Crawford,* a chancellor is limited to an award of contribution as a matter of equitable right. One co-tenant, by payment of money that protects the common property against loss or that enhances the value of the common property, has benefitted the other co-tenant, giving rise to an implied or quasi contract to repay, lest the beneficiary be unjustly enriched. But unless a co-tenant had been evicted or ousted from possession, there was no implied promise by the tenant who remained in possession to pay the co-tenant out of possession for his use and enjoyment of the premises, nor could the tenant out of possession offset his obligation for contribution by the value of the benefits enjoyed by the tenant in possession. *See Colburn v. Colburn, supra,* 265 Md. at 475–76, 290 A.2d 480; *Hogan v. McMahon, supra,* 115 Md. at 200, 80 A. 695; *Young v. Young,* 37 Md.App. 211, 221, 376 A.2d 1151, *cert. denied,* 281 Md. 746 (1977).

Under the Act, however, if there is marital property to support a monetary award, the chancellor has the ability to consider all factors that give rise to principles of equity. As Judge Rosalyn Bell, writing for this Court in *Spessard,* pointed out, under some circumstances "requiring contribution could create the very inequity which the Act was designed to prevent." 64 Md.App. at 96, 494 A.2d 701. If, as in this case, there is no substantial marital property that would enable the chancellor to achieve a better equitable result, there is certainly nothing in our previous holdings that would prohibit an award of contributions under the holdings of *Hogan, Schilbach, Colburn,* and *Crawford.*

The wife argues that the court erred in awarding contribution for mortgage payments made by the husband subsequent to their separation, asserting that the court found that she had been ousted from possession. At one point during the trial, the chancellor did say, in response to counsel's comment that the husband was entitled to *Craw-*

*ford* contributions, that if he made such an award he would be reversed by the Court of Special Appeals because the husband locked the wife out of the house and changed the locks. Further argument, however, obviously convinced him that there had been no ouster, since he did award contribution while fully aware that an ouster of the wife by the husband would have precluded him from doing so. The chancellor's final conclusion was that the parties had separated voluntarily, by mutual agreement; he granted the husband a divorce on that basis and dismissed the wife's amended counter-complaint for divorce in which she had asserted a constructive desertion. The husband's conduct in changing the locks after the parties' separation was not an ouster. The wife, having left the house voluntarily, never sought to return to it, so it cannot be said that the change of locks was equivalent to an eviction or denial of possession.

We note, however, that as expressed by the court the amount of the contribution award was excessive. The post separation mortgage payments made by the husband totaled $6,500; to "credit" the husband and "debit" the wife with that amount in distributing proceeds from the sale of their joint property would have the effect of requiring the wife to reimburse the husband for the whole sum he disbursed instead of the half that was her equitable obligation.

(b)

The court found that some $13,500 of the $44,000 joint indebtedness of the parties, for which there was an encumbrance on their property, represented sums of money that the husband had appropriated and spent for his own uses and purposes, including $7,000 he paid to his attorney. Since, in all good conscience and equity, he was obliged to reimburse the wife, the court properly ordered that he do so out of his share of the proceeds of their joint property. The difficulty is with the court's choice of language to effect this equitable reimbursement. Here we have the same problem of overcharges that we observed with respect to

the *Crawford* contribution. Debiting the husband and crediting the wife with a total of $13,500 has the effect of requiring the husband to reimburse the wife not only for her share of the money he spent but for his own share as well. A more appropriate remedy would have been to award the wife a money judgment in the amount of $6,750, which would be payable out of the husband's share of the proceeds from the sale of the realty.

V

The husband complains about the award of the $1,000 counsel fee, coupled with cancellation of the $250 counsel fee the court had previously ordered the wife to pay. Both parties find fault with the award of rehabilitative alimony—the husband believes that no alimony should have been awarded; the wife complains about the amount.

By striking out the prior $250 counsel fee, the court, in effect, awarded a counsel fee of $1,250 to the wife. Reviewing the evidence as to earnings and earning capacities of the parties and considering the division of property envisioned by the court, we detect no abuse of discretion in that award.

The principal function of alimony is rehabilitation, its purpose being to provide temporary support for such period of time as will enable the economically dependent spouse to become self-supporting. *Holston v. Holston*, 58 Md.App. 308, 473 A.2d 459 (1984). Although we find it difficult to understand how alimony totalling $300, payable in twelve monthly installments of $25, could have much rehabilitative effect, we are reluctant to conclude, in view of the evidence, that the award constituted an abuse of discretion.

Nevertheless, both the alimony and counsel fee awards may well have been predicated, at least in part, on the amount of money the court expected each party to receive from the sales of their jointly owned property. Since we are holding that the court erred in permitting the husband

to recoup $28,000 from the proceeds of the sales of property, the wife will, in effect, receive $14,000 more and the husband $14,000 less than the chancellor intended them to receive. That change in circumstance may very well cause the chancellor, upon remand, to reconsider the need, and thus the propriety, of either or both of the awards.

### Summary and Conclusion

The granting of the absolute divorce and the restoration to the wife of her prior name are not in dispute. We shall affirm that part of the judgment ordering the sale of the house and the business, because they are jointly owned properties subject to partition or sale in lieu thereof by virtue of § 8–202(b)(2) of the Act.

With respect to those portions of the judgment undertaking to distribute the proceeds of the partition sales of the joint properties, we shall affirm the allowance of $4,000 to Lavinia Adler in repayment of her loan to the parties, since there is no dispute about that item, but reverse the remaining provisions for distribution because (1) the award of $22,000 to the husband as repayment of his nonmarital contribution to the purchase of the business was the erroneous result of misconstruction and misapplication of the Act; (2) the "credit" to husband and "debit" to wife for *Crawford* contribution, although permissible in theory,[9] has the effect of doubling the amount of money that the wife should owe the husband for *her* share of the mortgage payments he made after the separation; and (3) the "credit[s]" to wife and "debits[s]" to husband for the borrowed money he applied to his sole use and benefit because they double the amount of money the husband should repay the wife for *her* share of the borrowed money he spent.

We shall also reverse the awards of alimony and counsel fees, since changes in the distribution of joint assets as a

---

9. Permissible, but not mandatory. The court may want to reconsider the *"Crawford* contribution" award upon remand as part of the reassessment of equities in view of changes mandated by the opinion.

result of our decision may have a material effect on the chancellor's determination as to the necessity and propriety of either or both of those awards.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART, AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLANT AND CROSS-APPELLEE, CHARLES T. KLINE.