626 A.2d 1062

Gary I. GOLDBERG

v.

Anita M. GOLDBERG.

No. 1544, Sept. Term, 1992.

Court of Special Appeals of Maryland.

July 2, 1993.

772

Richard D. Rosenthal, Baltimore, for appellant.

Bruce A. Kaufman (Andrea F. Kelly and Rosenthal, Kaufman & Ries, P.A., on the brief), Baltimore, for appellee.

Argued before GARRITY and MOTZ, JJ., and ROSALYN B. BELL, Judge (retired), Specially Assigned.

MOTZ, Judge.

Gary I. Goldberg, now 44, and Anita M. Goldberg, now 41, were married in 1971. They have two children: Nicole, born June 13, 1976, and Jeffrey, born July 25, 1979. During their marriage, Mr. Goldberg worked long hours outside the home—first for a family trucking company and then as a real estate developer and investor and as the chief executive officer of a clothing manufacturer. On the other hand, Ms. Goldberg, although employed part time as a travel agent, spent most of her married life in equally long hours working in activities centered around the home involved with being a wife and mother. The parties accumulated substantial assets during their marriage. When the trial of this case began on January 22, 1992, the parties agreed that they had been separated since October 14, 1989, and that the separation was mutual and voluntary with the express intent and purpose of ending their marriage. Virtually every other issue, except for custody of their children, was vigorously contested. As to custody, it was agreed that Mr. and Ms. Goldberg would have joint custody of Nicole and Jeffrey; Nicole's primary residence would be with her mother and Jeffrey's would be with his father. After seven days of testimony, this agreement was repudiated by Jeffrey's counsel and by Ms. Goldberg and so the custody and primary residence of Jeffrey also became a contested issue.

Judge Dana Levitz of the Circuit Court for Baltimore County heard a total of nine days of testimony from numerous witnesses including four experts, and received into evidence 115 exhibits. At the conclusion of the testimony the court reviewed extensive proposed findings of fact submitted by the parties and heard closing argument for approximately three hours. On March 4, 1992, Judge Levitz issued a sensitive, well reasoned, 31 page opinion in which he meticulously made numerous findings of fact, explained the basis for those find-

ings, and carefully applied the law to the facts.[1]

Mr. Goldberg appeals, raising five questions:

1. Did the lower court err in the monetary award

    A. By adding all values and then subtracting the total of the marital debt rather than subtracting marital debt from the value of each item of marital property and then totalling the net values?

    B. By utilizing incorrect appraisals or methods?

2. Did the court err in determining alimony, child support and the monetary award

    A. Did the court err in finding as a fact husband's ability to earn $400,000.00 a year when husband's employment ended without fault of husband?

    B. Was child support based upon erroneously attributed income?

    C. Was alimony based upon erroneously attributed income?

3. Should custody of the son have been awarded to husband?

4. Was the removal of husband as custodian of Uniform Gifts to Minors Act Accounts in error?

5. Was the award of counsel fees and costs to wife excessive?

Ms. Goldberg cross appeals, conditionally, asking us to consider the following issues only if we determine a remand is necessary because of the questions raised by Mr. Goldberg's appeal:

6. Did the trial court err when it subtracted appellant's debt from marital property without first determining that it was marital debt and was appellant harmed by the error?

7. Did the trial court err when it failed to award indefinite alimony to appellee?

---

1. The account of the facts set forth within is largely based on Judge Levitz's written opinion.

8. Did the trial court err in failing to award more of appellee's counsel fees and costs to her?

(i)

■ Mr. Goldberg initially asserts that the circuit court erred in two respects in making a monetary award to Ms. Goldberg. Both involve the valuation of the marital assets. Mr. Goldberg's principal claim of error is that the court relied upon "incorrect appraisal methodology" in determining the value of marital property.

In making the monetary award, the circuit court first determined which assets were marital property and then individually valued each of the assets. *See* Md.Code (1957, 1992 Repl. Vol., 1992 Supp.), §§ 8–203, 8–204 of the Family Law Article. Specifically, the court found that Ms. Goldberg's total assets had a value of $240,000, that she had "no significant debts" and that "the marital portion of those assets is $163,000; the non-marital portion is $75,000." [2] It found that Mr. Goldberg had assets of $2,950,000 and liabilities of approximately $996,-000 for a net worth of $1,954,000; it further found that $1,899,000 of Mr. Goldberg's "net worth is marital [assets] and $55,000 is non marital." Mr. Goldberg claimed below that certain assets titled in his name were his property alone; the circuit court rejected this claim, finding all five of these disputed assets marital property. On appeal Mr. Goldberg does not assert that the court erred in any way in determining which property was marital and which was non-marital.

Mr. Goldberg does vehemently assert, however, that the circuit court erred in valuing some of the marital property. Approximately $1 million of the marital property, titled in Mr. Goldberg's name, was real estate and bank accounts, marketable securities, or other liquid assets; Mr. Goldberg does not dispute the value given to this portion of the marital property. The remainder of the marital assets that were titled in Mr.

---

**2.** The parties do not explain, or complain of, the slight mathematical discrepancy, *i.e.,* $163,000 + $75,000 = $238,000 not $240,000.

Goldberg's name were interests in partnerships or closely held corporations or demand notes owed by the closely held corporations to Mr. Goldberg. It is the values the circuit court placed on some of these interests that Mr. Goldberg claims is error.

We note at the outset that many witnesses—including Mr. Goldberg's own accountant—testified that Mr. Goldberg was, as the circuit court found, "an astute, diligent and cautious investor." His net worth statements indicated that in the recent past virtually all of his assets were liquid. The parties came to own "illiquid" assets because, as the circuit court noted, "[s]ince 1987 when [Mr. Goldberg] first suggested a divorce ... he has invested approximately two million dollars of liquid assets into businesses and ventures that are extremely illiquid and whose values in the interim appear to be depressed because of the current economy." Judge Levitz further found that Mr. Goldberg

> was astute enough when he invested to believe that the effect of these investments would cause their value to appear to be less in the short term for the purposes of these proceedings.

We have carefully reviewed the enormous record—there is certainly substantial support for these findings. Mr. Goldberg's own expert conceded on cross examination that over the "course of the last two years" Mr. Goldberg "took $2½ to $3 million in liquid assets" and put them into partnerships and closely held corporations. Mr. Goldberg's net worth statements also reflect this change in investment strategy. Perhaps for those reasons, Mr. Goldberg does not directly challenge these findings.

He does assert, however, that the circuit court improperly valued these illiquid assets. The lower court heard extensive testimony from Mr. Goldberg and four experts as to the value of these assets. The court noted that it had considered and found "helpful" the testimony of all four experts, and believed "some, but not all of the testimony of each of the expert witnesses." The valuations found by the circuit court reflect

precisely this. Thus, although only Mr. Goldberg asserts that the circuit court's valuation of these "illiquid" assets was error, the circuit court did not by any means accept *all* the evaluations placed on them by Ms. Goldberg's expert, Dennis Weiner. Indeed, Judge Levitz accepted the valuations of Mr. Goldberg's expert as to a number of assets.[3]

The circuit court remarked that it was "particularly impressed with the professional manner in which Mr. [Dennis] Weiner [Ms. Goldberg's expert] testified." Again, the record contains a sound basis for this finding. Mr. Weiner, a certified public accountant, was a friend of both Mr. and Ms. Goldberg. He had worked as *Mr.* Goldberg's accountant in the past and was able to testify only because Mr. Goldberg waived the possible conflict. Mr. Weiner testified that, when he reviewed Mr. Goldberg's records for the divorce case, he found them in "disarray" and they were given to him "helter-skelter," although in the past when he worked for Mr. Goldberg, the records had always been "very orderly and organized." Mr. Weiner testified that in valuing these properties he attempted to determine their fair market value, which he defined as "what a willing buyer would pay and a seller accepts, neither being compelled to enter into the transaction." In formulating his valuations, he interviewed Mr. Goldberg, his accountants, and Gary Gomber, Mr. Goldberg's comptroller. Mr. Weiner examined all of the records provided to him, which included bank statements, cancelled checks, working papers of Mr. Goldberg's accountants, copies of tax returns, agreements, correspondence, and "reams of [other] papers." Mr. Weiner testified that he was not provided all the information that he had requested and that, if he had been, his valuations would probably have been higher.

---

3. Judge Levitz accepted the valuations of Mr. Goldberg's expert as to Exeter Engineering, Inc. (investment valued by Mr. Goldberg as $0 and by Ms. Goldberg as $1,000; demand note valued by Mr. Goldberg as $0 and by Ms. Goldberg as $93,000); Shearson Beverly Hills Partnership (valued by Mr. Goldberg as $6,500 and by Ms. Goldberg as $10,000); Jared Associates Partnership (valued by Mr. Goldberg as $0 and by Mrs. Goldberg as $25,000).

Mr. Weiner further explained that his methodologies for valuing the assets—*i.e.*, adjusted historical cost, capitalization of earnings, etc.—were set forth in a manual "subjected to a peer review and accepted by the practice [sic] companies practice section and the SEC practice section of ... the American Institute of CPAs," of which he was a member. He specifically described the reason for using a particular methodology for a particular piece of property. Many of the valuations disputed by Mr. Goldberg were based on an adjusted historical cost methodology. Mr. Weiner explained that when companies were newly formed or being developed by Mr. Goldberg, there was no past income or earnings on which to base a value. Because these investments were recently made by Mr. Goldberg, in an arms length transaction, and because Mr. Goldberg was known as an astute, cautious business investor, Mr. Weiner determined to value these properties at their adjusted historical cost—*i.e.*, how much Mr. Goldberg had recently invested in the corporation or partnership. This methodology was a "most conservative" one, Mr. Weiner asserted, because it assumed that Mr. Goldberg would only recover his costs and make no profit at all on any of these investments.

We have reviewed the record and find, as the circuit court did, that Mr. Weiner's testimony was, indeed, "impressive"; his valuations appear to be solidly based on the facts available to him and a recognized methodology. It well may be that adjusted historical cost is not often an appropriate valuation method. This method, however, appears an entirely appropriate way to evaluate some of the assets at issue in this case, involving as they did, interests in newly formed companies without any earning or profit history, recently purchased by a sophisticated, cautious investor in arms length transactions. As Mr. Goldberg acknowledges, a trial court is afforded "discretion ... in accepting or rejecting evidence to arrive at valuations for determining marital property." In *Quinn v. Quinn*, 83 Md.App. 460, 470, 575 A.2d 764 (1990) we noted:

Where, as here, there are two experts, the trier of fact must evaluate the testimony of both of them and decide which opinion, if any, to accept.

Judge Levitz did precisely this. There was no error in his valuations of the marital property.[4]

■ Mr. Goldberg's only remaining argument as to the monetary award is that the circuit court erred in adding all the marital assets together and then subtracting all the marital debts. This is not precisely what the circuit court did. What the court did was value the assets of each party and determine which of those assets were marital property and then subtract the marital debt in each party's name from the marital assets in that party's name. In Mr. Goldberg's case it determined that $2.9 million of his assets were marital property and that $996,000 in debts owed by him were marital debts. The court then subtracted the marital debts in Mr. Goldberg's name from the marital property in his name to conclude that $1,899,000 was his marital "net worth." The court found that the marital assets in Ms. Goldberg's name worth $163,000 and because she had no significant debts her marital "net worth" was $163,000. The court then determined to "adjust the equities of the parties": awarding Ms. Goldberg a $861,000

---

4. The valuations that Mr. Goldberg most vigorously disputes are those involving 4115 Lincoln Ave., Inc. Mr. Weiner valued a demand note from this corporation to Mr. Goldberg at its actual amount, $152,841, and Mr. Goldberg's investment in the corporation at its actual amount, $2,424. Judge Levitz accepted $2,424 as the value of Mr. Goldberg's investment but valued the demand note at $100,000. Mr. Goldberg asserts that neither the investment nor demand note is worth anything because, he claims, the principal asset of this corporation, an option to purchase valuable real estate, had expired, a view that he asserts is supported by the testimony of Ms. Goldberg's appraiser, Mr. Billig. Although Mr. Goldberg and his expert testified in support of the zero valuation, in fact, Mr. Billig testified that although the option had expired "on its face," Mr. Goldberg had told him "there were ongoing discussions and possible litigation with regard to a suit for specific performance" of the option. Rather than refuting this, Mr. Goldberg confirmed it, testifying it was "his recollection" that this matter was "in litigation" in order to keep the option "alive." These facts lend credence to the view that neither the option, nor Mr. Goldberg's note from the corporation owning the option, had no value.

monetary award plus a $39,123 award to equalize their IRAs (Mr. Goldberg does not challenge the IRA award) so that Mr. Goldberg and Ms. Goldberg would each be left with "just about $900,000."

There was certainly logic in what the circuit court did; however it did not follow the procedure mandated by the Court of Appeals. *See Zandford v. Wiens*, 314 Md. 102, 549 A.2d 13 (1988). What the circuit court should have done after it valued each marital asset was to subtract from the value of the marital asset any debt that is attributable to that asset. *Id.* at 108, 549 A.2d 13. Here, Mr. Goldberg's accountant testified as to Mr. Goldberg's debts, as follows:

a liability to Maryland National Bank for $125,000 related to Thirty-one Twenty-one St. Paul Street, $550,000 related to Ritters Lane, and $300,000 related to Republic National Bank on Parnes Feinstein.

The circuit court valued Mr. Goldberg's total interests in 3121 St. Paul Street as a marital asset with a value of $168,365; it should have subtracted the marital debt attributable to that asset, $125,000, to arrive at a net value of $43,365. Similarly, the lower court valued Mr. Goldberg's total interest in 61 Ritters Lane, Inc. as marital property with a value of $94,000; it should have subtracted the marital debt attributable to that asset, $550,000, to arrive at a net value of zero. As to Parnes Feinstein, the circuit court valued Mr. Goldberg's total interest in it as marital property with a value of $580,324; it should have subtracted the marital debt attributable to that asset, $300,000, to arrive at a net value of $280,324. If the circuit court had used the method mandated in *Zandford* then the amount of total marital property would have increased approximately $450,000 because the debt attributable to 61 Ritter Lane, Inc. was approximately $450,000 greater than the value of the asset and "marital debt cannot be transferred from one item of marital property to another. If the marital debt exceeds the value of the marital property acquired as a result of incurring the debt, the result is a zero value for the marital property acquired; marital property cannot have a negative

value." *Kline v. Kline*, 85 Md.App. 28, 45, 581 A.2d 1300 (1990), *cert. denied*, 322 Md. 240, 587 A.2d 246 (1991).

■ This error, however, as Mr. Goldberg's counsel straightforwardly conceded at oral argument, has not in any way prejudiced Mr. Goldberg. Judge Levitz determined, based on the erroneous calculation that net marital assets were $2,062,000 ($1,899,000 in Mr. Goldberg's name and $103,-000 in Ms. Goldberg's name), that a proper, equitable, monetary award to Ms. Goldberg was $861,000. If Judge Levitz had correctly calculated the net marital assets, they would have totalled $450,000 more or $2,512,000. That might have led the court to have increased the amount of the monetary award payable to Ms. Goldberg; it certainly would not have led to a decrease in the award. In view of the fact that Mr. Goldberg does not challenge the Fam.Law Art. § 8–205 determination that an $861,000 monetary award was proper [5] when marital assets were improperly calculated at approximately $2 million dollars, he can hardly maintain it was error because marital assets should properly have been calculated at approximately $2.5 million. Indeed, Mr. Goldberg was arguably benefitted by the judge's error. (Of course, the court could have determined that an $861,000 monetary award was appro-

---

**5.** It appears to us that there is no basis for such a challenge. Judge Levitz found:

[A]pplying the law to the facts of this case leads the Court to conclude that in this case a monetary award is absolutely necessary to adjust the equities of the parties. No case that this Court has had in six and a half years on the Bench more clearly epitomizes the need for the Marital Property Act. Were there no Marital Property Act, equity would be entirely defeated by the title concepts of property ownership. The Court recognizes that the statute does not require an equal division of value of marital property. What is required is a fair and equitable award. *Ohm v. Ohm*, 49 Md.App. 392 [431 A.2d 1371] (1981). Considering the law and the facts, it is the Court's view that the Defendant should pay to the Plaintiff the sum of $861,000.00 in addition to the transfer of the IRA funds previously mentioned to adjust the equities of the parties.

The evidence, as outlined above, certainly supports this finding. Indeed, in Mr. Goldberg's most recent financial statement, dated March 14, 1991, he stated his "estimated divorce settlement" as $800,000— only $61,000 less than the amount awarded by Judge Levitz.

784

priate even though marital assets were $450,000 greater). In any event, as he has conceded, he was not aggrieved by it. It has long been established that only the party aggrieved by a judgment can appeal it. *Pattison v. Corby,* 226 Md. 97, 101, 172 A.2d 490 (1961); *Buchwald v. Buchwald,* 175 Md. 103, 114–15, 199 A. 795 (1938); *Salmon v. Pierson,* 8 Md. 297, 300 (1855). *See Board of Trustees of Baltimore County Comm. Colleges v. RTKL Assoc., Inc.,* 80 Md.App. 45, 51, 559 A.2d 805 (1989).

(ii)

Mr. Goldberg's next argument is that the monetary award, alimony ($4,000 a month for 120 months), and child support award ($1,000 per month per child) were erroneous. Mr. Goldberg does not claim that no award of alimony and child support would be appropriate or that Ms. Goldberg or his children are self-supporting or have the ability to be self-supporting without these awards, or that there was not a gross disparity between his earning ability and assets and theirs. Rather, his sole claim on this point is that the awards were erroneous because they were based on a finding that he was able to earn $400,000 a year.

Mr. Goldberg initially maintains that specific findings are necessary to support a conclusion that he voluntarily impoverished himself. That argument misses the point. Judge Levitz did not find that Mr. Goldberg had impoverished himself—voluntarily or involuntarily. What Judge Levitz found was that Mr. Goldberg had consistently complicated his financial dealings to hide the true value of his assets and true amount of his income and that he had the ability to earn in excess of $400,000 a year:

> For the last 15 years the Defendant has engaged in elaborate and complex plans for the sheltering of income by the formation of corporate entities and various accounts, that the Defendant's manipulations have been so complex that it's virtually impossible to trace the source of funds for many of the Defendant's investments. That the Defendant constantly commingled his assets and passed them through

various corporate structures on a regular basis. That the Defendant's skill, knowledge and talent in financial manipulation make it probable that the defendant will continue to be financially successful and earn an income comparable to the average earned in the years 1984 to 1990, which is in excess of $400,000 a year.

Again, the record is replete with evidence that supports this conclusion. Indeed, Judge Levitz referred in his opinion to some of this evidence:

The adjusted gross income of the parties as declared on their income tax returns was as follows:

1984—$645,977 (gross income attributable to Wife—$1,400)

1985—$1,023,332 (gross income attributable to Wife—$3,366)

1986—$552,778 (gross income attributable to Wife—$11,000)

1987—$654,990 (gross income attributable to Wife—$11,000)

1988—$583,646 (gross income attributable to Wife—$10,490)

1989—$328,726 (gross income attributable to Wife—$17,666) (This is the first year that the parties began living separate and apart)

1990—$200,229 (gross income attributable to Wife—$16,000)

1991—Wife's income—$13,053 (no figure reported for Husband)

Mr. Goldberg does not claim that the above figures, taken from his income tax returns, are in any way erroneous. Thus he concedes that, in the years immediately prior to his divorce for which figures were available, his average adjusted gross income exceeded $400,000. Mr. Goldberg testified that his earning capacity had greatly diminished and that none of his new investments were producing appreciable income. At oral argument, Mr. Goldberg's counsel suggested that this testimony was significant because, he asserted, since Mr. Goldberg's income was almost entirely from capital gains, if assets were sold to pay the monetary award to Ms. Goldberg, they would not be available to produce the income necessary to fund the alimony and child support awards.

■ There are several problems with this argument. First, a trial judge is invested with the sound discretion to believe or disbelieve any witness. Judge Levitz apparently did not believe Mr. Goldberg. There was certainly evidence from which Judge Levitz could have concluded that Mr. Goldberg was less than credible, *e.g.*, his frequent memory lapses, particularly when questioned about damaging or embarrassing incidents, and his attempts to hide or obscure assets. Furthermore, although a circuit court must, of course, consider all financial resources of the party seeking alimony, including the monetary award before awarding alimony, *Newman v. Newman*, 71 Md.App. 670, 674, 527 A.2d 61 (1987), it is clear that Judge Levitz did this here. It may be that *if* Mr. Goldberg does have to sell assets to pay the monetary award, he will, as he testified, not have the ability to generate substantial income, or it may be that, with or without those assets, he has, as Judge Levitz believed, the "skill, knowledge and talent in financial manipulation" to produce an annual income in excess of $400,000. The simple fact is that we do not know. Judge Levitz carefully made the monetary award payable over a five year period, without interest. There will be ample time for Mr. Goldberg to seek a reduction in alimony if he believes it appropriate—indeed, we were told at oral argument that he already has done so. After careful review of the record in this case, however, we cannot conclude that Judge Levitz erred in basing the alimony, child support, and monetary awards on a finding that Mr. Goldberg would earn, as he had in the past, an annual income of $400,000.

(iii)

■ Mr. Goldberg asserts that custody of his son Jeffrey, born in 1979, should have been awarded to him, not to his wife. His argument is based on the parties' pre-trial agreement that they would have joint custody of both children, with Jeffrey primarily residing with Mr. Goldberg and their daughter, Nicole, primarily residing with Ms. Goldberg. Mr. Goldberg maintains without citation of authority, that "[i]t is the parents who are in the best position to determine the best

interests of the children." Although perhaps in an ideal world this would be so, recent social history, some of which is detailed in reported Maryland cases, makes it clear that this is not always so. *See, e.g., In re Maurice M.* 314 Md. 391, 550 A.2d 1135 (1988), *rev'd sub nom. Baltimore City Dept. of Social Serv. v. Bouknight,* 493 U.S. 549, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990).

We do not suggest that there is any evidence in this record of abuse of his children by Mr. Goldberg—there is none. There is, however, uncontradicted evidence that Mr. Goldberg's unorthodox, perhaps well intentioned, care of his son might well have led to serious problems. For example, Mr. Goldberg ignored medical advice and permitted Jeffrey, who suffers from Attention Deficit Disorder, to stop taking— for several months—his prescribed medication, Ritalin. The bargain assertedly struck by father and son was that if Jeffrey's grades did not improve, he would begin to take the medication again. Yet even when Jeffrey's grades—and behavior—worsened when he was off the medication, his father did not require him to resume taking it. Moreover, it is similarly uncontroverted that in the middle of the trial Jeffrey himself, through his counsel, indicated that he no longer wished to live with his father.

The circuit court carefully considered the evidence as to Jeffrey's custody and concluded:

> The parties are in agreement that Nicole should be in the custody of the Plaintiff. The Defendant requests that the parties have joint custody of Jeffrey with his primary residence being with the Defendant. Joint custody of Jeffrey is not a viable option at this point, based on the relationship of the parties, under the rationale of *Taylor v. Taylor,* supra. Hopefully at some time in the future the relationship of Mr. and Mrs. Goldberg will improve so that they can discuss important decisions regarding Jeffrey and the issue of joint custody can be revisited.
>
> This Court was disturbed when the agreement was initially presented to the Court which provided for the separation

of Jeffrey and Nicole. It is the Court's view that these siblings should not be separated and that it is in Jeffrey's best interest to be in the custody of his mother. The Court believes that the Plaintiff can provide Jeffrey with the stability, support and discipline that he needs. The Court believes that the Plaintiff will set limits for Jeffrey. It is the Court's belief that the Plaintiff will provide him with the necessary medical care and see to it that he takes the medication that he needs. The Plaintiff will be better able to be actively involved in Jeffrey's education and school selection. It is the Court's view that the Plaintiff can best serve Jeffrey's needs at this time. After reviewing the factors previously enunciated in this opinion, it is the Court's belief that it is in Jeffrey's best interest to award his custody to the Plaintiff, the person who has been his custodian his entire life except for a recent four-month period.

Nevertheless, the Court strongly feels that the Defendant should take an active role in Jeffrey's life. Obviously Jeffrey needs both his parents. Jeffrey needs to know that both parents love him and both want him and both care about him. Nevertheless, Jeffrey needs to know that one parent has the authority to make decisions and that that decision will be supported by the other parent. The Court believes that visitation should be awarded to the Defendant every other weekend....

The court did not abuse its discretion. *See Davis v. Davis,* 280 Md. 119, 125–126, 372 A.2d 231, *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977), *reh'g denied,* 434 U.S. 1025, 98 S.Ct. 754, 54 L.Ed.2d 774 (1978).

(iv)

██ Next, Mr. Goldberg asserts that the circuit court erred in removing him as custodian of the Uniform Transfer to Minors Act (UTMA) accounts established for his children. On this issue, the circuit court found:

The extensive assets in the children's names should be managed for the children's benefit. It is the opinion of the Court that a Trustee should be appointed to manage the

assets in the children's names. It is further the view of the Court that neither of the parties should serve as such trustee. Accordingly the Court will appoint a trustee to manage the children's assets.

The UTMA provides for removal of a custodian only in the following circumstances.

A transferor, the legal representative of a transferor, an adult member of the minor's family, a guardian of the person of the minor, the conservator of the minor, or the minor if the minor has attained the age of 14 years may petition the court to remove the custodian *for cause* and to designate a successor custodian other than a transferor under § 13–304 of this subtitle or to require the custodian to give appropriate bond.

Md.Code (1957, 1992 Repl.Vol., 1993 Supp.), § 13–318(f) of the Est. & Trusts Art. (emphasis added). There may, indeed, be reasons why the custodian of children's accounts should be changed. *See Sutliff v. Sutliff,* 515 Pa. 393, 528 A.2d 1318, 1325 (1987); *Application of Muller,* 18 A.D.2d 1067, 239 N.Y.S.2d 519, 520 (1963). The evidence here indicated that the younger child had $45,000 more assets in his account than his older sister and that Mr. Goldberg invested the children's assets in unorthodox investments. These facts may, or may not, constitute "cause" for removing Mr. Goldberg, as custodian.

The UTMA, under which these accounts were established, however, does not sanction the action of the court below. Here, there were no findings by the trial court that the evidence indicated "cause" for Mr. Goldberg's removal. *Compare Sutliff,* 528 A.2d at 1325. Nor did any person authorized by § 13–318(f) (*e.g.,* an adult member of the minor's family, guardian of the minor, the minor, or the minor's attorney) petition the court to remove Mr. Goldberg as the custodian. Accordingly, the circuit court was without authority to remove Mr. Goldberg as custodian. *See generally Appeal of Waitt,* 140 Me. 109, 34 A.2d 476, 478 (1943) (unless a party authorized by statute petitions to remove a guardian court has no juris-

diction to remove guardian); *In re Erpenbach's Will,* 245 Wis. 518, 15 N.W.2d 795, 797 (1944) (when statutory procedure for removing an executor is not followed court has no jurisdiction to remove him).[6]

(v)

Finally, Mr. Goldberg asserts that Judge Levitz erred in awarding Ms. Goldberg $40,000 in attorney's fees and $45,890 in expert fees. He asserts that these fees were "apparently" awarded for work done to obtain the monetary award and there is "no statutory authority for fees and costs in connection with the proceedings for a monetary award." Alternatively, he claims that if the fees were awarded for the "other awards of the judgment" then they are excessive.

These arguments are meritless. Prior to making the fee award, Judge Levitz specifically noted that § 11–110 of the Family Law Article permitted him "to order the payment of reasonable and necessary expenses incurred by a party prosecuting or defending an action for alimony." He explained:

> Before ordering such payment the Court must consider the financial resources and financial needs of both parties and whether there was substantial justification for prosecuting or defending the proceeding. The section allows the Court to award reimbursement for any reasonable and necessary expense which has been previously paid, and allow the Court to order that counsel fees be paid directly to the lawyer and that judgment be entered in favor of the lawyer.

Judge Levitz painstakingly examined the "financial resources and financial needs of both parties," § 11–110(c)(1) of the Fam.Law Art., and found as a fact that Ms. Goldberg had

---

6. Ms. Goldberg's counsel suggested at oral argument that this point may be moot because when the assets in these accounts were, after some time, turned over to a new custodian, the new custodian reported that the accounts, which once had assets exceeding $400,000, now had combined assets of $10,000. We trust, as Mr. Goldberg's counsel suggested, that this merely reflects a change in financial institutions holding the assets, not a depletion of the assets themselves. We are confident that Judge Levitz will deal appropriately with this matter.

substantial justification for prosecuting this action. *Id.,* § 11–110(c)(2). He further found that Ms. Goldberg had legal fees and necessary expert expenses "in excess of $150,000."

In light of these findings, the enormous financial resources of Mr. Goldberg in comparison to Ms. Goldberg, and Mr. Goldberg's testimony and conduct in attempting to hide these resources, making the time of experts and attorneys necessary, the circuit court did not err in awarding Ms. Goldberg $40,000 in attorney's fees and $45,890 in expert fees.

### (vi)

We need not reach Ms. Goldberg's issues because no remand for redetermination of alimony or monetary award is necessary here. Judge Levitz did a truly outstanding job of resolving fairly and compassionately a case in which acrimony and tension vibrate from even the written record. Except for the removal of Mr. Goldberg as custodian of the children's UTMA accounts, the judgment is affirmed.

JUDGMENT REMOVING APPELLANT GARY GOLDBERG AS CUSTODIAN OF THE UTMA ACCOUNTS REVERSED.

JUDGMENT AFFIRMED IN ALL OTHER RESPECTS.

COSTS TO BE PAID BY APPELLANT.[7]

---

**7.** Despite the fact that appellant was successful on reversing one issue, in our discretion, we are assessing all costs against appellant.