956 A.2d 829

Wayne Edward FLANAGAN

v.

Stephanie Bonn FLANAGAN.

No. 395, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Sept. 10, 2008.

494

496

Jane A. Canter (Charles Chlan & Associates, LLC, on the brief), Easton, for appellant.

Sharon M. VanEmburgh (Ewing, Dietz, Fountain & Kehoe, PA, on the brief), Easton, for appellee.

Panel: HOLLANDER, JAMES R. EYLER and WOODWARD, JJ.

HOLLANDER, J.

By "Divorce Order" dated March 15, 2007, the Circuit Court for Talbot County granted Stephanie Bonn Flanagan, appel-

lee, an absolute divorce from Wayne Edward Flanagan, appellant. In addition, the court granted a monetary award to appellee of $30,000; ordered the sale of the marital home, with equal division of proceeds; awarded contribution of $1,045.81 to appellant; and awarded appellee $2,500 in attorney's fees.

On appeal, Mr. Flanagan presents four contentions, which we have recast in the form of questions:

I. Did the court err in granting a divorce based on the ground of mutual and voluntary separation, and in not granting appellant a divorce on the ground of desertion?

II. Did the court err in granting appellee a marital award?

III. Did the court err in granting appellee a portion of her attorney's fees?

IV. Did the court err in denying the motion to revise or amend the judgment, or to clarify it, where a hearing on the motion could have provided potentially dispositive reasoning prior to the transmittal of the record that could have rendered this appeal unnecessary?

For the reasons that follow, we shall affirm in part, vacate in part, and remand for further proceedings.

## I. PROCEDURAL AND FACTUAL SUMMARY

The parties were married on November 23, 1984. It was a second marriage for each, and they have no children together. Ms. Flanagan left the family home on February 2, 2005.

On April 11, 2006, appellee filed a Complaint for Absolute Divorce on the ground of constructive desertion. Appellant filed an Answer and a Counter–Complaint for Absolute Divorce on May 17, 2006, on the ground of actual desertion. Among other things, each party sought a monetary award and attorneys' fees. At the time of trial on September 19, 2006, appellant was 68 years old and appellee was 64 years of age.

On September 15, 2006, the parties filed a Joint Statement of the Parties Concerning Marital and Non–Marital Property.

They agreed that the following four items were marital property: (1) their jointly-titled marital home, at 311 Kerr Avenue in Denton, Maryland, which was valued at $165,000, with a mortgage of $91,123.78, and a home equity loan of $19,998.76,[1] for a total equity of $53,877.46; (2) a retirement account owned by appellant, valued at $10,941.73 as of June 2006; (3) a 401(k) account owned by appellee, valued at $2,567.32, against which she had borrowed $1,886.84, for a total value of $640.48 as of August 2006; and (4) a 403(b) account owned by appellee, valued at $1,630.26 as of June 2006. The joint statement also said: "The parties agree that all issues with regard to the remaining property that they hold have been resolved."

Appellant was employed at an auto parts store, and received additional income from social security and a part-time auctioneering job. In 2006, he had a total annual income of $39,696. According to the parties' joint tax return, appellee earned $47,844 in 2005, as an administrator for the Grayce B. Kerr Fund.[2] She testified, however, that she contemplated retirement in October 2006, because her job was "stressful" due to personnel changes and a change in her work load, and she wanted "to be in closer proximity to a support system." She expected to receive a monthly social security benefit of $1,061, and to seek other employment to supplement her social security. Appellee also testified that she was taking several medications for cholesterol, depression, and panic attacks, and had seen two therapists since 2002.[3]

Appellee recounted that she moved out of the marital home on February 2, 2005, leaving appellant a letter explaining her decision. She and appellant had lived separate and apart since that date, with no hope of reconciliation.

---

1. The parties variously describe this loan as a "home equity loan," an "interest only loan," a "line of credit," and a "second mortgage." We shall refer to it as the home equity loan.

2. No testimony was presented as to appellee's 2006 earnings.

3. Neither therapist testified at the trial.

The letter was admitted into evidence. In particular, appellee cited appellant's drinking and internet sexual contacts as the reasons for her "decision," stating that "it is more painful to live with you than face life alone." The letter referred to an incident with a woman named Marianne (discussed *infra*), stating: "[Y]ou agreed during joint counseling that you would no longer engage in that behavior. And yet you have continued despite your agreement not to." Appellee also complained that appellant began "drinking every weeknight as soon as [he][got] home and start[ed] drinking as early as 3:30 in the afternoon on weekends." In addition, she claimed that she "walk[ed] on eggshells" when appellant drank, fearing that he would "erupt and spew forth confrontational, threatening and accusatory verbal bile enumerating my real and imagined slights, transgressions and shortcomings covering the last twenty plus years." Moreover, appellee commented:

> On the average, we spend 51 waking hours together a week. When you are sober I admire your intelligence, your wit and enjoy being with you. However, I have to deal with your varying degree of intoxication every night for a conservative average of 37 hours per week. This isn't the quality of life I expected to be leading at this stage of my life.

Ms. Flanagan added: "I have resolved not to live my life under these conditions any longer. I want peace."

In her testimony, appellee identified two reasons for her departure from the home, which were consistent with her letter. First, she pointed to appellant's alleged excessive drinking, which often led him to be "accusatory, argumentative, you know, all my faults, real and imagined for twenty years would be paraded out in front of me." Second, she complained about appellant's persistent "internet sexual contacts," which she discovered beginning in 2002. They consisted of visits to pornographic websites, which she characterized as "just nasty," as well as participation in "interactive chat rooms" and activity on dating websites. In December 2002, appellee discovered that appellant had made a date with another couple "to set up a sexual encounter with them at a future date. . . ." She contacted the other couple and arranged,

without appellant's knowledge, for the two couples to meet in order to confront appellant. According to appellee, appellant denied his online activity "[u]p until that point no matter what I said...." However, appellee noted that when the other woman, Marianne, "was standing in front of [appellant] with her boyfriend ... then he could no longer deny it because [the other woman] was there in person." Appellee indicated that she believed appellant's behavior had stopped for a time, but resumed in 2004.

In addition, appellee suggested that appellant was "threatening in his manner." But, she described only one incident of physical force, which occurred in January 2003, when appellant "threw a wallet" at appellee after a session of joint counseling.

Appellant stated that on the afternoon of February 2, 2005, as he was driving home from his job as an auctioneer at the Baltimore City tow lot, appellee called his cellphone and asked him to pull the car over. She then told him she was leaving. Claiming that he was "totally flabbergasted," appellant recalled that he "was close to passing out" from the news. When he returned to the marital home, all of the living room furniture and appellee's bedroom furniture were gone, as well as several boxes that he thought had been packed to go to an auction. He found appellee's farewell letter "on the desk next to the computer."

Appellant admitted to "prowling" for women on the internet in order to "add a little spice to [his] sex life." He explained that in 2002 he had a "severe prostatitis attack," which rendered him "dysfunctional." This condition prevented the parties from engaging in a physical relationship, and "stupidly" prompted him to visit online chat rooms, through which he conversed with a woman named Marianne. He arranged to meet her at an area restaurant, and she brought her boyfriend, Ron.[4] Appellant testified: "Marianne's demeanor did not appeal to me. She had tattoos. She was rough.... [A]nd

---

4. Neither Marianne nor Ron was called to testify.

I really wasn't planning on having sex with another male." So, appellant "bought them a bucket of clams and a couple of beers and left." Appellant claimed that, a week later, appellee told him she was taking him out to dinner. When they arrived at the restaurant, the other couple was there, and appellee "threw her arms around Marianne as if they were ancient friends...." Appellant testified: "I spun on my heel and walked out of [the restaurant] and spent the next two hours sitting in the parking lot by myself." Appellee remained in the restaurant with appellant's car keys.

Mr. Flanagan insisted that he had no other internet encounter after that incident. He maintained that sometime thereafter appellee "helped [him] solve the [sexual dysfunction] problem." He added: "And together I became functional again. I had no need to go on pornographic websites." Further, appellant recalled that the parties participated jointly in counseling. Because the internet chat rooms and the one meeting had created a serious problem between the parties, appellant claimed he "specifically promised [appellee] that [he] would never do it again," and never broke his promise.

In addition, appellant categorically denied ever striking appellee at any time during their marriage. He explained that the wallet incident was a result of appellee rummaging through his things, and he "threw it at her [saying] here, take the whole wallet and, and be done with it."

With regard to his alcohol consumption, appellant insisted that his drinking at home was limited to "a couple of cocktails" before or with dinner every other day or so, but that "after dinner I didn't drink anything at all." As for social drinking outside the home, he explained:

> [Appellee] had a very serious problem with her husband before me, we made some agreements that if I were to have drink number three, if I was out at any social engagement, if I had drink number three ... I would hand her voluntarily the car keys. There would be no fighting over who was going to drive home because she had had some pretty wild rides in the past with her [first] husband.

The evidence regarding the parties' financial status was uncontested. In addition to the items of marital property previously noted on the joint statement, appellee testified that she had a credit card with a balance of $5,351.48 and appellant had a credit card with a balance of $2,365. Appellee had a seven-year-old vehicle with 142,000 miles on it, while appellant had a 1996 Subaru station wagon with over 200,000 miles. Appellant retained his own bedroom set, and the remaining furniture and household items.

From the date of separation until the trial, appellant continued to reside in the marital home and pay the monthly mortgage and home equity loan. Appellee occupied an apartment at an initial rent of $750 per month, which increased at some point to $850 per month.

During the separation, appellant paid $17,749.36 toward the first mortgage and a total of $2,328.72 on the home equity loan, all but $2.00 of which was on interest, as the loan was an "interest only loan." Appellee testified that she left approximately $3,200 in the parties' joint bank accounts. Appellant testified that he used the money to pay for the parties' 2004 joint taxes, as well as the mortgages and the bill for their joint auto insurance policy.

In closing arguments, appellee requested a 50/50 split in the equity of the home, with no contribution from her toward the mortgage expenses. She also requested attorney's fees of $5,000. Appellant asked the court not to divide the equity in the house equally, because he had made all the payments on the encumbrances during the separation. He requested a monetary award to offset the payments on the house that he had continued to make. Appellant's counsel also suggested that "it would be fairer to just leave [the parties' retirement accounts] as they are and that any adjustments that you make be made through the equity in the house."

The court stated, in part:

We have a marriage of 21 years here and there have been good years. Unfortunately the marriage has reached a point that it has dissolved and I will tell you that I will find

grounds for a[n] absolute divorce. That's the easy part. The hard part will be to fairly determine what the proper dissolution of and division of assets should be. You have made it easy by making a determination as to the personal property, leaving only the issue of the real estate, the retirement benefits and the attorneys [sic] fees for the Court.

On February 27, 2007, the court issued a "Memorandum Opinion," [5] in which it found voluntary separation as the grounds for divorce. However, neither party had advanced the ground of voluntary separation. In relevant part, the Opinion also stated:

### III. *Agreement of Parties*

In the parties' Joint Statement Concerning Marital and Non–Marital property, the parties agreed that all issues with regard to all property other than the marital home have been resolved.

### IV. *Divorce*

Pursuant to Md.Code, Family Law Article § 7–103(a)(3), the testimony supports the grant of a divorce based on mutual and voluntary separation of more than 12 months. While the Wife physically deserted the marital home, the Husband allegedly constructively deserted her prior to her leaving. The undisputed testimony was that in February of 2005, [appellee] decided to leave the marital home. She did so after years of her husband's soliciting extramarital sexual relationships on the internet, his heavy drinking, and verbal abuse. . . . Neither party has attempted reconciliation. *Insofar as the separation became mutual and voluntary and both parties indicate there is no reasonable expectation of reconciliation in their Complaint and Counterclaim, the Court grants an absolute divorce.* (Emphasis added.)

---

**5.** The Memorandum Opinion did not include an Order. The Divorce Order was issued a few weeks later.

## V. *Monetary Award*

Mrs. Flanagan requests that this Court grant her a monetary award. Mr. Flanagan requests the same in his Counter–Complaint. As required by § 8–203 through § 8–205 of the Family Law Article, and the numerous appellate decisions which have followed the passage of the Marital Property Act, the Court must follow specific steps before granting a monetary award. First, the Court must identify what property is marital.... The Court must also value the marital property ... taking into account any marital debt incurred to acquire the property. Finally, before making any award, the Court is mandated to consider each of those factors listed in § 8–205(b).

With the exception of the family home, the parties have agreed on the identification and valuation of all marital property as indicated earlier.

The chancellor recognized that the parties' home was titled as tenants by the entirety. It found, according to the appraisal, that the value of the home was $165,000, with a mortgage of $91,237.28 and a home equity loan of $19,998.76.[6] There-

---

**6.** At the outset of its analysis, the court stated that "the family home was part marital and part non-marital property," because "the testimony indicate[d] that [appellant] received a $40,000 inheritance" that he deposited into the couple's joint account and then applied in part towards the down payment for the marital home. Nevertheless, in a ruling that neither party contests, the chancellor then found that "the entirety of Kerr Avenue is marital property," because "[t]here was no testimony nor exhibit that indicated how much the down payment was, nor how much of the inherited funds were used toward it," and the court declined to "speculate as to what the down payment may have been...."

In any event, Md.Code (2006 Repl. Vol., 2007 Supp.), § 8–201(e)(2) of the Family Law Article provides that " '[m]arital property' includes any interest in real property held by the parties as tenants by the entirety," as was the parties' home in this case, "unless the real property is excluded by valid agreement." Nevertheless, § 8–205(b)(9) permits the court to consider as a factor in the equitable distribution of marital property a party's contribution of non-marital funds to real property titled as tenants by the entirety. *See generally Gordon v. Gordon,* 174 Md.App. 583, 622–34, 923 A.2d 149 (2007); John F. Fader II & Richard J. Gilbert, MARYLAND FAMILY LAW § 15–9(a), at 15–39 to –44 (4th ed. 2006, 2007 Supp.) (discussing statutory and case law development). In its

fore, the court ruled that "the calculation of the marital property valuation will be the fair market value of Kerr Avenue at $165,000, less the outstanding mortgage liens of $91,123.78 and all other liens of $19,998.76, or *$53,877.46*." (Emphasis in original.) The chancellor ordered the sale of the marital home, with "net proceeds of the sale ... to be divided equally between the parties."

Thereafter, the court turned to the "monetary award adjustment," making findings with respect to the factors in Md.Code (2006 Repl.Vol., 2007 Supp.), § 8–205(b) of the Family Law Article ("F.L.").[7] We pause to review the chancellor's analysis of the eighth factor, as it is not discussed *infra*.

F.L. § 8–205(b)(8) requires the court to consider when and how the parties acquired an interest in any pension, retirement, profit sharing, or deferred compensation plan, as well as family use personal property and the parties' marital home, and the effort expended by each party in acquiring such property. The court valued appellant's retirement account at a total of $10,941.73, as compared to $2,310.74 for the total of appellee's two accounts. It commented: "[Appellant's one retirement account is worth more than four times as much as [appellee's] accounts combined."

The court concluded: "Taking into consideration all of the above factors, this Court awards the Wife a monetary award of $30,000, which may be paid to her from the net proceeds of the sale of the Kerr Avenue home." In addition, the chancellor awarded $2,500 in attorney's fees to appellee.

As noted, the court issued its "Divorce Order" on March 15, 2007. Notably, it did not specify the grounds for divorce. It said, in part:

---

discussion of § 8–205(b)(9), the court "concluded that there was not enough evidence to show that non-marital assets were used to acquire the home."

7. Appellant challenges the court's analysis of several of the factors, which we discuss, *infra*.

**ORDERED** that [appellee] is granted an absolute divorce from [appellant], and its is further

**ORDERED** that each party keep their own retirement accounts; and it is further

**ORDERED** that [appellee] shall receive a monetary award in the amount of $30,000; and it is further

**ORDERED** that [appellant] shall receive an award of contribution in the amount of $1,045.81; and it is further

**ORDERED** that the property known as 311 Kerr Avenue, Denton, Maryland, shall be sold by a Trustee, to be named, and the net proceeds to be distributed according to the Memorandum Opinion . . ., and it is further

**ORDERED** that [appellant] shall pay $2,500 towards [appellee's] legal fees. . . .

On March 26, 2007, appellant filed a Motion to Revise or Amend the Judgment and for Clarification. The court denied the motion, without a hearing, on April 18, 2007. Appellant noted this appeal on April 20, 2007. Then, on August 13, 2007, after appellant obtained an Irrevocable Line of Credit in the amount of $3,500, in lieu of a supersedeas bond, the circuit court stayed the previously ordered sale of the marital home pending the outcome of this appeal.

We shall include additional facts in our discussion, as relevant to the issues.

## II. DISCUSSION

### A. Grounds for Divorce

Appellant contends that the chancellor erred in granting a divorce on the ground of voluntary separation, arguing: "This conclusion is not supported by the evidence, as the testimony of both parties and the one witness, as well as all of the pleadings, are silent on that issue, nor is granting a divorce on that ground sustainable as a matter of law." He also contends that appellee was not entitled to a divorce on the grounds of constructive desertion, because appellee was not "fearful of physical violence," nor had there ever been any such violence.

He asserts: "The element of threatened bodily harm is clearly the linchpin necessary to prove the marital relationship cannot be sustained. Without it, a divorce based on constructive desertion cannot be granted."

Appellee responds that appellant's "argument on the grounds of divorce alleges mistakes in both fact and law." She maintains that "there was ample evidence in the record to support the Chancellor's findings," because it was "undisputed that at the time of the hearing, the parties had been physically separated for more than twelve (12) months, and there was no reasonable expectation of reconciliation. At some point after the initial separation, the separation became mutual and voluntary." She insists that "[t]he element[s] of mutuality and separation need not coincide at the inception of the separation." Appellee explains:

> The fact that separation begins with the abandonment of one spouse by the other, or with one spouse merely resigned to the reality of the division, does not preclude a subsequent conversion of the disjunction into one that is voluntary.... Both parties' failure to seek reconciliation, coupled with their living separate and apart, and their acknowledgment that there is no reasonable expectation of reconciliation establishes voluntary separation for the statutory period.

Alternatively, appellee asserts: "Assuming *arguendo* that the Chancellor's analysis of the mutual and voluntary separation was flawed, there was ample evidence in the record for the Chancellor to award Mrs. Flanagan a divorce on the grounds of constructive desertion." Moreover, she argues that any error is "harmless," asserting:

> Assuming *arguendo* that the Court made an error in granting the divorce on the grounds of mutual and voluntary separation, what difference does it make? It doesn't. Both of these parties want a divorce. The only aspect of this case that is affected by the circumstances that contributed to the estrangement of the parties is the marital award. The statutory factor that requires the Chancellor to consider the circumstances that contributed to the estrange-

ment of the parties does not require a finding of constructive desertion as a prerequisite to ordering a marital award, it only requires the Chancellor to consider the circumstances of the separation. For the reasons set forth in Part II of this Argument, the Chancellor's findings of fact with respect to the circumstances that contributed to the estrangement of the parties was not clearly erroneous. Any error on the part of the court in mischaracterizing the grounds for divorce was harmless (i.e. Mr. Flanagan has not been harmed by a divorce on the grounds of mutual and voluntary separation given that the Chancellor could have granted the divorce on the ground of constructive desertion, which was entirely consistent with the Chancellor's findings of fact).

█ In Maryland, the permissible grounds for divorce are governed by statute. *Ledvinka v. Ledvinka*, 154 Md.App. 420, 436, 840 A.2d 173 (2003) ("[D]ivorce is a creature of statute and only the grounds enumerated in the statute will support a divorce decree."). *See also, e.g., Thomas v. Thomas*, 294 Md. 605, 610, 451 A.2d 1215 (1982); *Foote v. Foote*, 190 Md. 171, 176, 57 A.2d 804 (1948). F.L. § 7–103(a) provides the permissible bases for an absolute divorce, which include the following:

(2) desertion, if:

(i) the desertion has continued for 12 months without interruption before the filing of the application for divorce;

(ii) the desertion is deliberate and final; and

(iii) there is no reasonable expectation of reconciliation;

(3) voluntary separation, if:

(i) the parties voluntarily have lived separate and apart without cohabitation for 12 months without interruption before the filing of the application for divorce; and

(ii) there is no reasonable expectation of reconciliation;

* * *

(5) 2–year separation, when the parties have lived separate and apart without cohabitation for 2 years without interruption before the filing of the application for divorce[.]

As noted, appellee's complaint alleged constructive desertion, while appellant alleged actual desertion in his counterclaim. In its Memorandum Opinion, the court awarded a divorce on the basis of "mutual and voluntary separation of more than 12 months." It reasoned that, following appellee's departure from the marital home on February 2, 2005, "[n]either party has attempted reconciliation. Insofar as the separation became mutual and voluntary and both parties indicate there is no reasonable expectation of reconciliation ... the Court grants an absolute divorce." In its subsequent Divorce Order, the court did not specify any ground for the divorce. *See Borne v. Borne*, 33 Md.App. 578, 581 & 588, 365 A.2d 359 (1976) ("When only one ground is alleged in a complaint, and a divorce is granted, it is unnecessary for the decree to state the ground. When more than one ground is alleged, however, it is desirable that the decree specify the ground upon which the divorce is granted. This is especially true for obvious reasons when one ground is culpatory and one is non-culpatory.").

■ In regard to a voluntary separation, the evidence must establish that the parties were separated voluntarily for the requisite period. In *Wallace v. Wallace*, 290 Md. 265, 277, 429 A.2d 232 (1981), the Court said:

[T]he proof does not support the conclusion made by the chancellor that a mutual separation for twelve months prior to the filing of the complaint existed, for the evidence indicates that this durational requirement was not met. It appears that the acquiescence of the respondent was transformed into a mutual agreement of the parties, as the court found, sometime late in June, 1977, and as the amended bill was filed on June 6, 1978 (assuming that this, and not the date the original complaint was filed, is the operative date with which we are concerned), the requisite twelve month

separation prior to the filing of the bill cannot be said to have transpired.

■ We addressed the elements of voluntary separation in *Aronson v. Aronson,* 115 Md.App. 78, 691 A.2d 785, *cert. denied,* 346 Md. 371, 697 A.2d 111 (1997). There, the wife sought a divorce from her husband "on the grounds of adultery and a two year separation." *Id.* at 81, 691 A.2d 785. We set forth the following facts, *id.* at 81–82, 691 A.2d 785:

When the trial commenced . . . on those grounds, the parties had only lived separate and apart for twenty-two and a half months. Moreover, the wife had condoned the adultery in issue. Thus, the two year separation ground was not quite ripe, and there was reason to believe that the adultery would not withstand a challenge. Under these circumstances, it is particularly noteworthy that the parties had not agreed in advance of trial to an amendment of the complaint on the ground of a one year voluntary separation. Further, their separation agreement did not suggest that both parties wanted to end the marriage. Nevertheless, with only a few weeks remaining to achieve the unassailable two year ground, trial commenced in the Circuit Court for Baltimore County.

At trial, over the husband's vigorous objection, the court permitted appellee to amend her complaint to include a claim for divorce based on a one year voluntary separation. Ultimately, the court granted appellee an absolute divorce on that ground.

On appeal, the husband challenged the grounds for divorce. We began our analysis by reviewing the Court of Appeals's decision in *Wallace,* 290 Md. 265, 429 A.2d 232. We said, 115 Md.App. at 96–97, 691 A.2d 785 (some citations omitted; italics in *Aronson;* boldface added):

What the *[Wallace]* Court said is pertinent here:

In order to establish the existence of the twelve month voluntary separation ground for divorce *a vinculo* . . . three elements must be shown: (i) an express or implied agreement to separate, *accompanied by a mutual intent*

*not to resume the marriage relationship;* (ii) voluntarily living separate and apart without cohabitation for twelve months prior to the filing of the bill of complaint; and (iii) that the separation is beyond any reasonable hope of reconciliation.

*Id.* at 275 [429 A.2d 232] (emphasis added); *see also Smith v. Smith,* 257 Md. 263, 266 [262 A.2d 762] (1970). Indeed, the Court of Appeals has consistently held that voluntariness requires an agreement to live separate and apart, coupled with a common intent to terminate the marriage. *See Sullivan v. Sullivan,* 234 Md. 67, 72 [197 A.2d 910] (1964); *Foote v. Foote,* 190 Md. 171, 179 [57 A.2d 804] (1948). . . . *See also* John F. Fader, II & Richard J. Gilbert, MARYLAND FAMILY LAW, § 3–5(d), at 83 (2d ed.1995). . . .

In contrast, "[a]cquiescence in or assent to what one cannot prevent does not amount to a voluntary agreement to separate." Fader & Gilbert, *supra,* § 3–5(d), at 83; *see also Lloyd v. Lloyd,* 204 Md. 352, 359 [104 A.2d 595] (1954) ("Even the realization by both husband and wife that their separation is final . . . does not of itself establish an agreement that they shall live apart."). **Nevertheless, the elements of mutuality and separation need not coincide at the inception of the separation. Indeed, an involuntary separation may later be transformed into a voluntary separation.** *Wallace,* 290 Md. at 277 [429 A.2d 232]; *see also* Fader & Gilbert, *supra,* § 3–5(d), at 83. **Thus, a separation that begins as a desertion may later achieve "voluntary" status.**

We noted in *Aronson* that proof of a *mutually* voluntary separation was lacking. We explained, *id.* at 103, 691 A.2d 785:

[A]ppellee never affirmatively represented that both parties wanted to end the marriage. Instead, in response to a question from her attorney about whether appellant objected to ending the marriage, she merely said: "We really never talked about it, but he never objected." Apart from testimony that appellant agreed to the separation, she failed to describe statements or conduct by appellant that evinced

his intent to end the marriage. Moreover, appellee's assertion that the parties agreed that she would move out of the marital home does not distinguish between an agreement to separate, which appellant concedes, and an agreement to separate for the particular purpose of terminating the relationship, which appellant contests.

In concluding that vacatur of the divorce decree was required, we explained, *id.* at 97–98, 691 A.2d 785 (some citations omitted; italics added in *Aronson;* boldface added):

> In sum, the cases teach that a voluntary separation must be accompanied by a mutual intent to terminate the marriage; mutuality of intent is a component of voluntariness. Voluntary, " 'when used in reference to a common act of two or more persons affecting their common relationship . . . means that they acted in willing concert in the doing of the act.' "
>
> In order to be awarded a decree of divorce for voluntary separation, the plaintiff must establish that the parties entered into a mutual and voluntary agreement to separate *and* not to resume the marital relationship. **The separation for the purposes of the statute commences on the date that this agreement occurs even if the parties have separated prior to reaching this agreement.**

Bernard A. Raum, MARYLAND DOMESTIC RELATIONS LAW § 4:16 (1996) (emphasis added; footnotes omitted).

Appellee's position is at odds with *Wallace* and *Aronson;* there was no evidence below of an agreement to separate that existed for the requisite duration. Specifically, no evidence was presented as to whether or when appellant affirmatively agreed to terminate the relationship. When appellee left the marital home in February 2005, there was no evidence that the parties had a mutual agreement to separate with the intent to end the marriage. To the contrary, the evidence clearly showed that it was a unilateral decision of appellee. Moreover, as we made clear in *Aronson,* one party's acquiescence to what he cannot prevent does not constitute a volun-

tary agreement to separate. Nor was there evidence of such an agreement by April 11, 2005, i.e., one year before appellee filed her Complaint for Absolute Divorce. *See* F.L. § 7–103(a)(3)(voluntary separation is ground for divorce if "the parties voluntarily have lived separate and apart without cohabitation for 12 months without interruption *before the filing of the application for divorce* ") (emphasis added). *See also, e.g., Wallace,* 290 Md. at 277, 429 A.2d 232 ("[T]he requisite twelve month separation prior to the filing of the bill cannot be said to have transpired.").

Appellee's reliance on the filing by appellant of a Counter–Complaint for Absolute Divorce is also unavailing. That filing, on May 17, 2006, did not demonstrate that appellant agreed to terminate the nuptial bond at the time that is relevant, i.e., at least one year prior to April 11, 2006—or assuming that appellant's Counter–Complaint established a new date by which the separation could be measured, one year prior to May 17, 2006. *See Wallace,* 290 Md. at 277, 429 A.2d 232 (assuming without deciding that the date of the amended complaint was relevant date for purposes of voluntary separation).

■ Moreover, appellant's Counter–Complaint based on desertion did not establish his agreement to a no-fault divorce. Voluntary separation is a no-fault ground, while appellant counterclaimed based on desertion, which is a fault-based ground. *Cf. Wagner v. Wagner,* 109 Md.App. 1, 12, 674 A.2d 1 ("The trial court subsequently granted Mr. Wagner a divorce ... on grounds of desertion, having found Ms. Wagner to be at fault for the demise of the marriage."), *cert. denied,* 343 Md. 334, 681 A.2d 69 (1996); *Lemley v. Lemley,* 102 Md.App. 266, 281, 649 A.2d 1119 (1994) ("With the introduction of 'no-fault' divorce based on a voluntary one-year separation ... or an involuntary separation ... the issue of constructive desertion as grounds for divorce rarely reaches this Court."). As we recognized in *Aronson,* the fact that a party seeks to end the marriage on the basis of fault does not establish the party's

acquiescence to a no-fault termination. We explained, *id.* at 98, 691 A.2d 785 (emphasis added; citation omitted):

> The essential difference, apart from time, between the one year separation and the two year separation embodied in F.L. § 7–103(a)(5) is that the one year separation must be "founded upon a ground which is *consensual and not culpatory,* manifesting an intention to permit the marriage relationship to be terminated in law, as well as in fact, *without regard to fault.*"

*See also Matysek v. Matysek,* 212 Md. 44, 48–50, 128 A.2d 627 (1957) (suit by spouse seeking fault-based divorce may militate against finding of voluntary agreement to separate in later suit).

▆▆▆ Accordingly, we agree with appellant that the court erred in granting a divorce on the ground of voluntary separation. Nevertheless, we are equally convinced that any error was harmless. We explain.

In *Flores v. Bell,* 398 Md. 27, 33–34, 919 A.2d 716 (2007), the Court of Appeals recently summarized the harmless error doctrine as it applies to civil cases:

> It has long been the policy in this State that this Court will not reverse a lower court judgment if the error is harm less. *Greenbriar v. Brooks,* 387 Md. 683, 740 [878 A.2d 528] (2005); *Crane v. Dunn,* 382 Md. 83, 91 [854 A.2d 1180] (2004). The burden is on the complaining party to show prejudice as well as error.[8] *Greenbriar,* 387 Md. at 740 [878 A.2d 528]; *Crane,* 382 Md. at 91 [854 A.2d 1180]; *Beahm v. Shortall,* 279 Md. 321, 330 [368 A.2d 1005] (1977).
>
> Precise standards for determining prejudice have not been established and depend upon the facts of each individual case. *Fry v. Carter,* 375 Md. 341, 356, 825 A.2d 1042 (2003); *see also State Deposit v. Billman,* 321 Md. 3, 17, 580 A.2d 1044 (1990) (reiterating that appellate court balances

---

8. In a footnote, the Court observed: "Courts may presume prejudice, under certain circumstances, although it is the exception rather than the rule. [Citing cases]."

the probability of prejudice from the face of the extraneous matter with the circumstances of the particular case). Prejudice can be demonstrated by showing that the error was likely to have affected the verdict below; an error that does not affect the outcome of the case is harmless error. *Crane,* 382 Md. at 91, 854 A.2d 1180; *Beahm,* 279 Md. at 331, 368 A.2d 1005. We have also found reversible error when the prejudice was substantial. *Fry,* 375 Md. at 356, 825 A.2d 1042. The focus of our inquiry is on the probability, not the possibility, of prejudice. *Crane,* 382 Md. at 91, 854 A.2d 1180; *Harford Sands, Inc. v. Groft,* 320 Md. 136, 148, 577 A.2d 7 (1990). We discussed the standard of review in civil cases in *Crane,* 382 Md. 83, 854 A.2d 1180, noting as follows:

> "Prejudice will be found if a showing is made that the error was likely to have affected the verdict below. 'It is not the possibility, but the probability, of prejudice which is the object of the appellate inquiry.' ... Substantial prejudice must be shown. To justify the reversal, an error below must have been '... both manifestly wrong and substantially injurious.' "

*Id.* at 91–92, 854 A.2d 1180 (citations omitted).

■ The harmless error doctrine is perhaps invoked more often in connection with a procedural error than with a substantive error. But, the doctrine applies with equal force to legal errors, so long as no substantial injury to the appellant results from the error. *See, e.g., Storetrax.com, Inc. v. Gurland,* 397 Md. 37, 51–53, 915 A.2d 991 (2007) (in review of lower court's choice of law analysis, holding that where "we cannot discern the difference, if any, in the outcome of this case whether the laws of Maryland or Delaware are applied to the facts of the present case ... any technical error on the part of the Circuit Court in its analysis of choice of law principles was harmless").

The court did not specify a ground in the Divorce Order. Although the Memorandum Opinion found a voluntary separation, we discern no substantial injury that accrued to appellant as a result of that finding, rather than a finding of desertion or

constructive desertion. As appellee underscores, appellant clearly wanted a divorce, as evidenced by his counter-complaint, and he obtained the relief he sought, i.e., an absolute divorce.

Moreover, there was an adequate factual basis in the record for an absolute divorce on the grounds of either actual or constructive desertion. In *Ricketts v. Ricketts*, 393 Md. 479, 487–88, 903 A.2d 857 (2006), the Court explained:

Desertion may be constructive or actual. *See, e.g., Walker v. Walker*, 209 Md. 428, 431, 121 A.2d 195 (1956). We have defined actual desertion as

"the voluntary separation of one of the married parties from the other, or the refusal to renew suspended cohabitation, without justification either in the consent or the wrongful conduct of the other party ... [Furthermore,] the separation and intention to abandon must concur, and desertion does not exist without the presence of both. The two need not begin at the same time, but desertion begins whenever to either one the other is added."

*Boyd v. Boyd,* 177 Md. 687, 688, 11 A.2d 461 (1940) (citations omitted).

Here, the record supported a finding of constructive desertion, the ground alleged by appellee.[9] Moreover, the court made factual findings that were consistent with constructive desertion.

We explained the showing required for a divorce based on the basis of constructive desertion in *Lemley, supra,* 102 Md.App. at 281, 649 A.2d 1119 (emphasis in original; internal citations omitted):

The question, as framed by the Court of Appeals, is whether [one spouse] has engaged in "such conduct as would make a continuance of the marital relationship inconsistent with the

---

**9.** If the court had found that appellee's departure on February 2, 2005, was not justified, either by appellant's consent or his wrongful conduct, it could have found that appellee had committed an actual desertion, as alleged by appellant.

health, self-respect and reasonable comfort of the other." There must be "a pattern of persistent conduct which is detrimental to the safety or health of the complaining spouse, *or so demeaning to his or her self-respect as to be intolerable.*" As the italicized language suggests, it is not necessary in every case to show that the safety or physical health of a spouse is threatened; a grave threat to a spouse's self-respect alone may be sufficient.

*Accord Ricketts,* 393 Md. at 488–89, 903 A.2d 857. *See also Carpenter v. Carpenter,* 257 Md. 218, 224–25, 262 A.2d 564 (1970); *Stewart v. Stewart,* 256 Md. 272, 278–82, 260 A.2d 71 (1969).

■ The findings of the court below were tantamount to a finding of constructive desertion, and were supported by the record. Notably, the court below found that appellee "decided to leave the marital home ... after years of her husband's soliciting extramarital sexual relationships on the internet, his heavy drinking and verbal abuse." Moreover, as appellee points out, "only slight corroboration is required," *Kelsey v. Kelsey,* 186 Md. 324, 328, 46 A.2d 627 (1946), and it may "'come from the other spouse.'" *Colburn v. Colburn,* 15 Md.App. 503, 512, 292 A.2d 121 (1972) (citation omitted). Among other things, appellant admitted to having prowled on the internet to "jazz up [his] sex life."

In sum, because the court made findings to support the award of divorce based on constructive desertion, which findings were not clearly erroneous, we regard as harmless the court's error in its Memorandum Opinion, in which it found a voluntary separation.

## B. Monetary Award

We turn to appellant's challenge to the monetary award. In connection with divorce proceedings, the Marital Property Act, codified in Title 8, Subtitle 2 of the Family Law Article, provides for the equitable distribution of marital property. Marital property is defined as "property, however titled, acquired by 1 or both parties during the marriage." F.L. § 8–

201(e)(1). Under F.L. § 8–201(e)(3), marital property does not include the following categories of property:

"[M]arital property" does not include property:

(i) acquired before the marriage;

(ii) acquired by inheritance or gift from a third party;

(iii) *excluded by valid agreement;* or

(iv) directly traceable to any of these sources. (Emphasis added.)

When the division of marital property by title is inequitable, the chancellor may adjust the equities by granting a monetary award. *See Long v. Long,* 129 Md.App. 554, 579, 743 A.2d 281 (2000) (recognizing that the judge has "all the discretion and flexibility he needs to reach a truly equitable outcome."). In *Ward v. Ward,* 52 Md.App. 336, 339–40, 449 A.2d 443 (1982), we elucidated the concept of the monetary award, stating:

The monetary award is ... an addition to and not a substitution for a legal division of the property accumulated during marriage, according to title. It is "intended to compensate a spouse who holds title to less than an equitable portion" of that property.... What triggers operation of the statute is the claim that a division of the parties' property according to its title would create an inequity which would be overcome through a monetary award.

(Internal citation and emphasis omitted).

In order to determine whether to grant a monetary award, the chancellor must follow a three-step procedure. *See* F.L. §§ 8–203, 8–204, 8–205; *Alston v. Alston,* 331 Md. 496, 499–500, 629 A.2d 70 (1993); *Gordon v. Gordon, supra,* 174 Md.App. 583, 623–24, 923 A.2d 149 (2007); *Collins v. Collins,* 144 Md.App. 395, 409, 798 A.2d 1155 (2002). First, for each disputed item of property, the chancellor must determine whether it is marital or non-marital. F.L. §§ 8–201(e)(1); 8–203. Second, the chancellor must determine the value of all marital property. F.L. § 8–204. Third, the chancellor must decide if the division of marital property according to title

would be unfair. If so, the chancellor may make a monetary award to rectify any inequity "created by the way in which property acquired during marriage happened to be titled." *Doser v. Doser,* 106 Md.App. 329, 349, 664 A.2d 453 (1995). *See* F.L. § 8–205(a); *Long,* 129 Md.App. at 578–79, 743 A.2d 281.[10]

In regard to a monetary award, the chancellor is required to consider the statutory factors contained in F.L. § 8–205(b). *See Ware v. Ware,* 131 Md.App. 207, 213–14, 748 A.2d 1031 (2000); *Doser,* 106 Md.App. at 350, 664 A.2d 453. F.L. § 8–205(b) states:

(b) *Factors in determining amount and method of payment or terms of transfer.*—The court shall determine the amount and the method of payment of a monetary award, or the terms of the transfer of the interest in property described in subsection (a)(2) of this section, or both, after considering each of the following factors:

(1) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(2) the value of all property interests of each party;

(3) the economic circumstances of each party at the time the award is to be made;

(4) the circumstances that contributed to the estrangement of the parties;

(5) the duration of the marriage;

(6) the age of each party;

(7) the physical and mental condition of each party;

(8) how and when specific marital property or interest in property described in subsection (a)(2) of this subsection was acquired, including the effort expended by each party in

---

**10.** A 2006 amendment to F.L. § 8–205(a), Acts 2006 ch. 431, empowers the court to transfer ownership of an interest in "real property jointly owned by the parties and used as the principal residence of the parties when they lived together," in addition to or in lieu of a monetary award. F.L. § 8–205(a)(2)(iii). However, the amendment only applies prospectively to divorce actions filed on or after October 1, 2006, *see* Acts 2006 ch. 431 § 2. Therefore, it is inapplicable here.

accumulating the marital property or the interest in property described in subsection (a)(2) of this section, or both;

(9) the contribution by either party of property described in § 8–201(e)(3) of this subtitle to the acquisition of real property held by the parties as tenants by the entirety;

(10) any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

(11) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in property described in subsection (a)(2) of this section, or both.

■■■■■■ Ordinarily, it is a question of fact as to whether all or a portion of an asset is marital or non-marital property. The value of each item of marital property is also a question of fact. We review the chancellor's factual findings under the clearly erroneous standard. *See* Rule 8–131(c); *Noffsinger v. Noffsinger,* 95 Md.App. 265, 285, 620 A.2d 415, *cert. denied,* 331 Md. 197, 627 A.2d 539 (1993). An appellate court "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c).

■■■■■■ In contrast, we review the chancellor's determination of questions of law under a "de novo" standard of review. *Shenk v. Shenk,* 159 Md.App. 548, 554, 860 A.2d 408 (2004). Moreover, the ultimate decision regarding whether to grant a monetary award, and the amount of such an award, is subject to review for abuse of discretion. *Alston,* 331 Md. at 504, 629 A.2d 70; *Gordon,* 174 Md.App. at 626, 923 A.2d 149; *Malin v. Mininberg,* 153 Md.App. 358, 430, 837 A.2d 178 (2003); *Chimes v. Michael,* 131 Md.App. 271, 282–83, 748 A.2d 1065, *cert. denied,* 359 Md. 334, 753 A.2d 1031 (2000). Under that standard, "we may not substitute our judgment for that of the fact finder, even if we might have reached a different result. . . ." *Innerbichler v. Innerbichler,* 132 Md.App. 207, 230,

752 A.2d 291, *cert. denied,* 361 Md. 232, 760 A.2d 1107 (2000).[11] Although our review for abuse of discretion is deferential, "a trial court must exercise its discretion in accordance with correct legal standards." *Alston,* 331 Md. at 504, 629 A.2d 70.

Appellant faults the chancellor's bottom line decision to make a monetary award of $30,000 to appellee. In addition, he challenges several of the circuit court's antecedent determinations, which we shall discuss, *infra.*

After reviewing the relevant factors drawn from F.L. § 8–205(b), the chancellor concluded, in a single sentence, that $30,000 was an appropriate award. As noted, it said: "Taking into consideration all of the above factors, this Court awards the Wife a monetary award of $30,000, which may be paid to her from the net proceeds of the sale of the Kerr Avenue home." Because the circuit court did not adequately explain the basis for its monetary award, and because the award resulted in appellee's entitlement to almost 90% of the value of the marital property, we shall vacate the award and remand for further proceedings. We explain.

Appellant contends that the chancellor's award of $30,000 to appellee exceeded his expected share of the proceeds of the marital home ($26,938.73), and thus gave appellee "the entire value of the marital property." He also maintains that "the order of 'contribution' awarded to [appellant] appears to be a second marital award in his favor, in the form of a *Crawford* credit not referenced as such, though there can be only one marital award per case."

---

11. The Court of Appeals has explained:

"There is an abuse of discretion 'where no reasonable person would take the view adopted by the [trial] court[ ]' ... or when the court acts 'without reference to any guiding rules or principles.' An abuse of discretion may also be found where the ruling under consideration is 'clearly against the logic and effect of facts and inferences before the court[ ]' ... or when the ruling is 'violative of fact and logic.'" *Wilson v. John Crane, Inc.,* 385 Md. 185, 198, 867 A.2d 1077 (2005) (quoting *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 312–13, 701 A.2d 110 (1997) (internal citations omitted)).

Further, appellant argues that the award "is not supported by the facts in the record, but the rest of the relevant sentence in the Memorandum Opinion is even more indicative of the confused rationale employed." According to appellant, "[t]his pronouncement makes no rational sense, the Court having already ordered that the proceeds were to be divided equally, stating that those proceeds would be $26,938.73 each." Appellant continues:

That figure [of $26,938.73] is an outer-limits figure, in that it does not reflect the potential costs of sale, and the receipt of $26,938.73 each would be ... the best case scenario. Of course, it is arithmetically impossible to pay $30,000 out of $26,938.73, and as the Court has already ordered each party to keep his or her retirement account, as well as failed to consider the existence or value of any other marital property, this pronouncement is clearly erroneous.

Appellee rejects appellant's assertion that the chancellor's statement that the $30,000 could be paid "from the net proceeds of the sale of the Kerr Avenue home" was incompatible with the fact that each party's share of the proceeds would be less than $ 30,000. She argues,:

[T]he Chancellor is not required to dictate to [appellant] exactly how he is to pay the entire marital award. Clearly, [appellant] will need to pay [appellee] $3,061.27 in excess of the proceeds from the sale of the marital home. Whether [appellant] chooses to withdraw money from his retirement account, borrow the funds, or use funds that he currently has is his choice. The reference to the net proceeds of the sale related more to the timing of when the marital award should be paid (i.e. at the time the house is sold) as opposed to the source for one hundred percent of the funds.

In addition, appellee disputes appellant's argument that the award of $30,000 to her exceeded the value of the marital property. She notes that appellant's retirement account was valued at "$10,941.73, which was more than four times that of [appellee's] retirement accounts." "Clearly," she argues, "the marital award of $30,000 does not exceed [appellant's] share of

the net proceeds and his retirement accounts, to say nothing of the vehicle, personal property and household items that he retained."

Finally, she argues that appellant mischaracterized the award of contribution as a second monetary award. She explains:

The award of contribution is based on equitable principles having no relationship to the Marital Property Act. *Kline v. Kline,* 85 Md.App. 28, 47 [581 A.2d 1300] (1990), *cert. denied,* 322 Md. 240 [587 A.2d 246] (1991). Instead, contribution is based on the law of tenancy, including, as in this case, tenancies by the entireties. *Colburn v. Colburn,* 265 Md. 468 [290 A.2d 480] (1972). The award of contribution is not a matter of right and is within the sound discretion of the trial court. *Keys v. Keys,* 93 Md.App. 677, 681 [614 A.2d 975] (1992). Although under the Marital Property Act, the Chancellor has the ability to consider all factors that give rise to principles of equity, including contribution, contribution can be awarded even if there is no substantial marital property and a monetary award is not authorized. *Kline,* 85 Md.App. at 49 [581 A.2d 1300]. It follows then that the award of contribution is not itself a monetary award. Thus, the Chancellor did not commit error by awarding two monetary awards. Although admittedly the Chancellor could have included the contribution within the calculation of the monetary award, the decision to list the contribution separately was not an abuse of discretion.

Appellant relies on our decision in *Ward v. Ward, supra,* 52 Md.App. 336, 449 A.2d 443 (1982), to support his position. In that case, the chancellor had resolved the disposition of marital property, worth a total of $32,000, by awarding $50,000 to the husband and $10,000 to the wife. *Id.* at 340–42, 449 A.2d 443. We determined that the ruling "violate[d] the most basic principles governing monetary awards." *Id.* at 343, 449 A.2d 443. First, we observed, *id.* at 343, 449 A.2d 443 (footnote omitted):

Since the function of a monetary award is to adjust the parties' equities in the marital property, it is elemental that a court cannot make an award whose amount exceeds the total value of the marital property. Here the court awarded $50,000 (or a net of $40,000) based on marital property worth only $32,000.

"Second," we said, "the statute contemplates but one net monetary award—or none—but certainly not two. There is no authority in [the Marital Property Act] for making a $50,000 award to one spouse and a $10,000 award to the other." *Id.* Finally, we determined "that the chancellor gave no more than lip service to the [statutory] factors." *Id.* In our view, "the inescapable conclusion flowing from a consideration of the . . . factors is that the balance was even," *id.* at 342–43, 449 A.2d 443, and thus we saw "nothing fair or equitable in a five to one ratio, based on the court's findings." *Id.* at 343–44, 449 A.2d 443 (footnote omitted). Of import here, we concluded that "[t]he effect of the chancellor's award [was] to give the husband the entire value of the marital property. Such a decision constituted clear error." *Id.* at 344, 449 A.2d 443.

Appellee is correct that, in contrast to *Ward,* the monetary award of $30,000 to appellee did not exceed the total value of the marital property. Nevertheless, the monetary award is startlingly large in light of the total value of the marital property. And, it does have the effect of awarding appellee the entire value of the marital home.

Although the parties' retirement accounts constituted a portion of the marital property, appellant asked the court to allow the parties to keep their respective retirement accounts and adjust any inequity via a monetary award; the chancellor did not mention the retirement accounts as marital property for distribution in his Memorandum Opinion.[12] Indeed, the court asserted in its Memorandum Opinion that "the parties

---

12. Although appellee is correct that appellant's retirement account is worth more than four times the value of appellee's accounts, the actual difference between the parties' retirement accounts is only $8,670.99, which is less than a third of the chancellor's $30,000 award.

agreed that all issues with regard to all property other than the marital home have been resolved." Thus, the parties kept their retirement accounts according to title. But, the chancellor's ruling essentially required appellant to pay his share of the proceeds of sale of the marital home to appellee, and then choose between paying the remainder of the award from his retirement funds or from non-marital property.[13]

In fact, the effect of the chancellor's order was to award appellee over 86% of the marital property-a six to one ratio. We elaborate below.

The total marital property value is:

| | | |
|---|---|---|
| | $53,877.46 | (total net value of home) |
| + | $10,941.73 | (appellant's retirement account) |
| + | $ 2,270.74 | (appellee's retirement total value) |
| | $67,089.93 | (TOTAL value of marital property) |

Under the chancellor's order, appellee would receive:

| $26,938.73 − $1,045.81 = | $25,892.92 | (half of net value of home, less contribution award) |
|---|---|---|
| + | $30,000.00 | (marital award) |
| +$1,630.26 + $640.48 = | $ 2,270.74 | (value of appellee's retirement) |
| | $58,163.66 | (TOTAL marital property retained by appellee) |

In contrast, appellant would receive:

| $26,938.73 + $1,045.81 = | $27,984.54 | (half of net value of home, plus contribution award) |
|---|---|---|
| + | $10,941.73 | (appellant's retirement account) |
| − | $30,000.00 | (marital award) |
| | $ 8,926.27 | (TOTAL marital property retained by appellant) |

Thus, the portion of the marital property retained by appellee amounts to approximately 87% of the total marital property: $58,163.66 (appellee's share) divided by $67,089.93 (the value of all marital property) = 86.7%. In its Memorandum

---

13. A significant disparity in the award of marital property might achieve an equitable result if it offsets a profound inequity in the distribution of the parties' non-marital property. However, as we discuss *infra*, the circuit court did not determine the value of the non-marital property held by each party. Therefore, we cannot say that the monetary award was intended to adjust an inequity caused by disparity.

Opinion, the court did not explain the enormous percentage on the basis of appellant's conduct leading to the parties' estrangement, or indeed on any particular basis.

We have overturned monetary awards when the trial court's disposition demonstrated a great disparity in light of the statutory factors. Although such decisions are relatively infrequent, given the deferential nature of the discretionary standard of review, *Ward* is not unique in our case law. For instance, in *Long, supra,* 129 Md.App. 554, 743 A.2d 281, although we could not "fault the chancellor's thorough treatment of the statutory factors," we vacated an award of "less than 20 percent of the marital assets to Wife," where the trial court's analysis of the factors tipped in favor of the wife in several respects. *Id.* at 577, 743 A.2d 281. We have also determined that, " 'if the spouse to whom the court intends to grant a monetary award already owns (and thus will retain) any marital property, the award cannot exceed the value of the marital property owned by the other spouse.' " *Brewer v. Brewer,* 156 Md.App. 77, 109, 846 A.2d 1 (citation omitted), *cert. denied,* 381 Md. 677, 851 A.2d 596 (2004).

Here, the sizeable, unexplained disparity resulting from the monetary award compels us to vacate the award.[14] What we said in *Long,* 129 Md.App. at 577–78, 743 A.2d 281 (internal citations omitted), is instructive:

> The judgment here defeats the purpose of the monetary award, which is to achieve equity between the spouses where one spouse has a significantly higher percentage of the marital assets titled [in] his name. Although an equal division of the marital property is not required, the division must nevertheless be fair and equitable. To do otherwise is an abuse of discretion.

Moreover, as we shall explain, the chancellor's underlying analysis was flawed with respect to some, though by no means all, of the factors leading to the monetary award. We shall

---

**14.** Because we vacate on this ground, we need not consider whether the chancellor's separate award of contribution to appellant constituted an impermissible second monetary award.

address appellant's contentions with regard to those factors as guidance for the court and the parties on remand.

Appellant first directs our attention to the circuit court's determination of what constituted marital property. Pursuant to Md. Rule 9–207, the parties submitted a joint statement of marital and non-marital property. Under Rule 9–207(a), "[w]hen a monetary award or other relief pursuant to [F.L.] § 8–205 is an issue, the parties shall file a joint statement listing all property owned by one or both of them." The form statement provided by the rule permits the parties to designate which property they agree is marital property, which property they agree is not marital property (including property "excluded by valid agreement"), and property whose marital character is disputed. *See* Md. Rule 9–207(b). The form statement also allows each party to assert his or her view as to title, fair market value, and any liens or encumbrances upon each item of property. *Id.*

In *Beck v. Beck,* 112 Md.App. 197, 203–208, 684 A.2d 878 (1996), *cert. denied,* 344 Md. 717, 690 A.2d 523 & 345 Md. 456, 693 A.2d 354 (1997), we construed the predecessor to Rule 9–207, then denominated Rule S74. In reviewing the history of the Rule, we quoted from the Ninety–Sixth Report of the Standing Committee on Rules of Practice and Procedure, 13 Md. Reg. 2305 (1986), in which the proposed Rule was formally submitted to the Court of Appeals. *See Beck,* 112 Md.App. at 206, 684 A.2d 878. The Rules Committee stated, 13 Md. Reg. at 2305:

> Proposed Rule S74 emanates from a recommendation of the Conference of Circuit Judges. In divorce cases where the disposition of property or a monetary award based on marital property is at issue, the filing of a joint statement before trial, identifying all of the property at issue and the positions of the parties with respect to that property will greatly assist the court in understanding and resolving the disputes.

In the Committee's Explanatory Note for the Rule, it said, 13 Md. Reg. at 2306 (emphasis in original):

Proposed Rule S74 responds to concerns expressed by the [C]onference of Circuit Judges in a letter of October 14, 1985. Trial judges around the State routinely encountered litigants who were unprepared to present evidence as to the value of marital and non-marital property. In view of the mandate of [F.L.] § 8–204 that "the court *shall* determine the value of all marital property", the conference felt that a summary statement filed in advance of trial would aid trial judges in deciding issues of the nature and value of property.

The *Beck* Court also quoted the minutes of the meeting of the Rules Committee at which the recommendation of proposed Rule S74 was discussed. According to the minutes, Judge Wilner " 'advised that presently, without such a procedure, there is an avalanche of undisputed matters wasting the court's time. *The proposed procedure, Judge Wilner continued, simply narrows the areas of dispute for the court.* The procedure has the additional benefit, he added, of promoting settlements.' " *Beck,* 112 Md.App. at 207, 684 A.2d 878 (quoting minutes; *Beck* Court's emphasis).

Rule 9–207, which has been derived without major modification from Rule S74, thus facilitates the chancellor's decision-making by clarifying, before trial, areas of dispute and agreement between the parties. In *Beck,* we observed, 112 Md. App. at 207–208, 684 A.2d 878:

It is clear that the purpose of the rule was to provide for a method by which, through the use of the admissions or stipulations contained in the [Joint] Statements, the trial courts, in the absence of other evidence, would, nevertheless, be able to comply with the Family Law Article provision mandating that the trial courts "shall determine the value of all marital property."

Accordingly, we concluded that "the admissions and stipulations contained in Maryland Rule ... S74 Statements, when filed in a case as required, may be considered as evidence by trial courts without the necessity of formal introduction of such statements at trial." *Id.* at 208, 684 A.2d 878.

As noted, the joint statement filed in this case identified only four items of marital property: the marital home; appellant's retirement account; and appellee's two retirement accounts. The joint statement contained no disputes as to the marital character, title, or value of any items of marital property. Of particular significance, it also contained an agreement "that all issues with regard to the remaining property that [the parties] hold have been resolved."

Nevertheless, appellant now contends that the monetary award did not conform with the command of F.L. § 8–204 to "determine the value of all marital property," because the chancellor "did not properly consider all of the marital property owned by the Flanagans. . . ." He argues:

[T]he parties did not stipulate that no other property existed, only that some of it had been divided between them prior to the hearing. In fact, as both testified at trial to owning retirement assets, vehicles, and to their joint accumulation of a houseful of furniture, much of which had been removed on February 2, 2005, the Court was aware of both the existence of all those items and . . . who held possession and title to them at the time of the hearing.

In support of his position, appellant relies on *Cotter v. Cotter,* 58 Md.App. 529, 473 A.2d 970, *cert. denied,* 300 Md. 794, 481 A.2d 239 (1984). There, we said, *id.* at 535–36, 473 A.2d 970:

After recognizing that the house, the household furnishings, the two automobiles, and the Colorado land fall within the definition of marital property, the chancellor gave them no further consideration, commenting that "they have been disposed of by agreement of the parties." The only assets valued and considered for the purpose of making a monetary award were the husband's pension, the jointly owned stock, and the boat. **The chancellor apparently concluded that assets which the parties agree to divide equitably between them need not be regarded as factors to be considered in making a monetary award, but the statute requires the inclusion and evaluation of *all* marital**

**property.** Unless all marital properties are taken into account, the chancellor cannot properly consider all of the ... factors ... in determining a fair and equitable award.

(Italics in Cotter; boldface added). *Accord Court v. Court,* 67 Md.App. 676, 687, 509 A.2d 693 (1986); *Campolattaro v. Campolattaro,* 66 Md.App. 68, 78–79, 502 A.2d 1068 (1986).

Appellant's reliance on *Cotter* is misplaced. Our decision in *Cotter* predated the enactment of Rule S74, the predecessor to Rule 9–207. Thus, the parties' "agreement" in *Cotter* did not take the form of a Joint Statement pursuant to Rule 9–207. In the words of Judge Wilner, quoted in *Beck,* the purpose of Rule 9–207 is to provide a means for the parties to " 'narrow[ ] the areas of dispute for the court [and] promot[e] settlements.' " *Beck,* 112 Md.App. at 207, 684 A.2d 878 (quoting Judge Wilner's comments at Rules Committee meeting; emphasis removed).

 F.L. § 8–201(e)(3)(iii) specifically provides that property "excluded by valid agreement" is no longer marital property. We have held that, " '[i]n order to exclude property "by valid agreement" from the reach of a monetary award, the parties must specifically provide that the subject property must be considered "non marital" or in some other terms specifically exclude the property from the scope of the Marital Property Act.' " *Golden v. Golden,* 116 Md.App. 190, 203, 695 A.2d 1231 (citation omitted), *cert. denied,* 347 Md. 681, 702 A.2d 290 (1997). An agreement such as the one set forth in the parties' joint statement, that "all issues with regard to the remaining property that they hold have been resolved," when articulated in a Rule 9–207 statement, meets the criteria explicated in *Golden:* it "specifically exclude[s] the property from the scope of the Marital Property Act," *Golden,* 116 Md.App. at 203, 695 A.2d 1231, and thus removes the property from the marital property pool that is subject to division. If it were otherwise, the purposes underlying Rule 9–207 would be thwarted, because the parties' joint statement would not narrow the issues before the chancellor.

■ Accordingly, an agreement reflected in a joint statement under Rule 9–207, to the effect that the parties have resolved the disposition of certain marital property, serves to render that property non-marital, pursuant to F.L. § 8–201(e)(3)(iii). To the extent that *Cotter*, 58 Md.App. 529, 473 A.2d 970, *Court*, 67 Md.App. 676, 509 A.2d 693, and *Campolattaro*, 66 Md.App. 68, 502 A.2d 1068, are inconsistent with that proposition, they have been superseded by the rule. As we discuss *infra*, however, the fact that property may be excluded from the marital property "pool," by agreement of the parties in a Rule 9–207 joint statement, does not mean that the court may not consider such non-marital property as a factor in its equitable distribution of the remaining marital property.

Appellant also contends that the court erred in the third step of the marital property analysis, with respect to its consideration of the factors set forth in F.L. § 8–205(b).[15] As to the first factor, the monetary and non-monetary contributions of each party to the family's well-being, F.L. § 8–205(b)(1), the court stated:

> Based on the testimony and exhibits, the Court concludes that prior to their separation, both parties equally contributed to the well-being of the family, both in a monetary and non-monetary way. After the separation, the Court concludes that the Husband has made greater monetary and non-monetary contributions toward maintenance and upkeep of the family home, the most significant asset of the marriage.

Appellant observes that the court recognized his payment of approximately $900 per month toward the mortgage on the

---

15. Appellant does not dispute the chancellor's analysis of factors five (duration of the marriage); six (ages of the parties); nine (non-marital contribution to real estate titled as tenants by the entireties); or the applicability of ten (the amount of any alimony award, as alimony was not sought). Although appellant correctly observes that the court should have stated that the duration of the marriage was through the date of divorce, and not the date of separation, *see, e.g., Otley v. Otley*, 147 Md.App. 540, 554, 810 A.2d 1 (2002), appellant appears to concede that this was harmless error.

marital home, for a total of $20,491.62. He complains, however, that the court did not consider that appellant also made payments on the couple's home equity loan.

Although appellant concedes the correctness of the chancellor's finding that appellee left approximately $3,200 in the couple's joint bank account, which appellant used to pay marital expenses, he takes issue with the court's finding that he made a "greater" post-separation contribution, when, in fact, he made "the only contribution in this regard, primarily from his own earnings." He asserts: "Other than having used a good part of the $3,200 left behind by [appellee] when she left toward the parties' 2004 tax bills, which clearly accrued when they were still together, what he earned paid their bills."

We fail to discern clear error or abuse of discretion as to this factor. "The chancellor is not required to articulate every fact upon which he relies." *Cousin v. Cousin,* 97 Md.App. 506, 518, 631 A.2d 119 (1993). Under discretionary review, "a trial judge's failure to state each and every consideration or factor" does not, without demonstration of some improper consideration, "constitute an abuse of discretion, so long as the record supports a reasonable conclusion that appropriate factors were taken into account in the exercise of discretion." *Cobrand v. Adventist Healthcare, Inc.,* 149 Md.App. 431, 445, 816 A.2d 117 (2003). Appellant's characterization of the facts is entirely consistent with the court's conclusion that appellant made "greater monetary and nonmonetary contributions" than appellee to the maintenance and upkeep of the family home.

As to the second factor under F.L. § 8–205(b), the value of all the property interests of both parties, appellant refers to his argument founded on *Cotter, supra,* 58 Md.App. 529, 473 A.2d 970, and contends: "[T]he analysis of the second factor, as stated above, fails to even remotely consider the value of *all* of the marital property, so [it] is flawed in that regard." In its consideration of this factor, the court evaluated only the net value of the marital home, which the chancellor calculated as $53,877.46, after deducting from the stipulated fair market

value of $165,000 the value of the mortgage ($91,123.78) and the home equity loan ($19,998.76). Appellant concedes that the chancellor's "math is correct."

In response, appellee acknowledges that the court only mentioned the home in its discussion of this factor, but argues that the court "clearly considered other property to be marital property and articulated it elsewhere in his Memorandum Opinion. The Chancellor specifically referred to the retirement accounts that each party had in its name and the values attributed to those accounts." Appellee also observes that the other personal property owned by the parties, such as their two vehicles and their furniture, was divided by agreement. She states: "Presumably, [both parties] felt the division of personal property was fair." In her view, consideration of fairly divided property would not have altered the court's conclusion.

As discussed above, the court did not err under F.L. § 8–204(a) in excluding from consideration what became the parties' non-marital property; that section requires the court to "determine the value of all marital property" for equitable distribution. By stipulating in their Rule 9–207 joint statement that they had resolved all issues with respect to certain property, the parties effectively transmuted such property into non-marital property.

 The same rationale does not apply, however, in the context of F.L. § 8–205(b)(2). With respect to the *amount* of a monetary award, that provision instructs the court to consider "the value of all *property interests of each party* " (emphasis added), which includes non-marital property. Unlike F.L. § 8–204, which governs what property is subject to distribution by the court, F.L. § 8–205(b)(2) requires that, in evaluating the equities between the parties, the court must consider all of the property of each party, both marital and non-marital. That would necessarily include marital property that becomes non-marital by virtue of the parties' agreement in a Rule 9–207 statement. *See Merriken v. Merriken,* 87 Md.App. 522, 545, 590 A.2d 566 (1991) ("[I]nattention to the nonmarital

property is in derogation of the court's statutory obligation to consider 'the value of all property interests of each party . . . .' ' ").

Appellee claims that calculation of "a value for the personal property that both [parties] agreed was fairly divided" would not "change the outcome with respect to the monetary award." We disagree. In light of the amount of the monetary award, discussed *supra*, we cannot say that appellant has not suffered any injury from the court's failure to consider all of the parties' property interests. The same can be said of the court's discussion of the third factor, "the economic circumstances of each party at the time the award is to be made[.]" F.L. § 8–205(b)(3). *See Merriken*, 87 Md.App. at 545, 590 A.2d 566.

As to the fourth factor, "the circumstances that contributed to the estrangement of the parties," F.L. § 8–205(b)(4), the court's analysis of this factor was succinct: "[Appellee] left the marital home after years of her husband's soliciting extramarital sexual relationships on the internet, his heavy drinking, and verbal abuse." Appellant complains that "the decision does not make any reference whatsoever to the conflicting testimony or attempt to either reconcile or distinguish the differing point of view to which [appellant] testified." Moreover, he contends that, in light of the chancellor's grant of divorce on the grounds of voluntary separation rather than constructive desertion, "this paragraph of the Memorandum Opinion is internally inconsistent with its earlier pronouncements, whether correct or not."

Again, we disagree. " 'The trier of fact may believe or disbelieve, accredit or disregard, any evidence introduced.' " *Walker v. Grow*, 170 Md.App. 255, 275, 907 A.2d 255 (citation omitted), *cert. denied*, 396 Md. 13, 912 A.2d 649 (2006). *See also Edsall v. Huffaker*, 159 Md.App. 337, 342, 859 A.2d 274 (2004), *cert. denied*, 387 Md. 122, 874 A.2d 917 (2005). But, the court was not required to *discuss* allegedly conflicting testimony. Nor is there necessarily any inconsistency between the court's factual findings as to the parties' estrange-

ment and its decision to award a divorce based on voluntary separation. The court was not required to grant a divorce on the most culpable grounds available, under a " 'badder-is-better standard.'" *Welsh v. Welsh*, 135 Md.App. 29, 64–66, 761 A.2d 949 (2000) (citation omitted), *cert. denied,* 363 Md. 207, 768 A.2d 55 (2001).

In addition, appellant contests the chancellor's analysis of the seventh factor, "the physical and mental condition of each party." *See* F.L. § 8–205(b)(7). He complains that the Memorandum Opinion "only references [appellee's] uncorroborated medical conditions, and makes no reference to [appellant's] prostatitis; in fact he is not mentioned at all."

To be sure, in regard to the parties' health, the court only discussed appellee, cataloging her "depression, high blood pressure, and panic attacks...." But, we agree with appellee that the record before the chancellor did not compel the conclusion that appellant currently suffers from a particular malady. As appellee points out, appellant's testimony about his prostatitis did not concern his "current health status." Rather, he testified that "in 2002, he suffered from a prostatitis attack that left him dysfunctional sexually for a period of time, but that at some point before the separation, [he] had become functional again.... In addition, [appellant] testified that his current health status is 'generally good.'" Therefore, we discern no clear error in the chancellor's failure to describe appellant's health. *See, e.g., Schade v. Maryland State Board of Elections,* 401 Md. 1, 33, 930 A.2d 304 (2007) ("If any competent material evidence exists in support of the trial court's factual findings, those findings cannot be held to be clearly erroneous."). *See also, e.g., Chesapeake Bank of Maryland v. Monro Muffler/Brake, Inc.,* 166 Md.App. 695, 705, 891 A.2d 384, *cert. denied,* 392 Md. 726, 898 A.2d 1005 (2006); *L.W. Wolfe Enterprises, Inc. v. Maryland Nat'l Golf, L.P.,* 165 Md.App. 339, 343, 885 A.2d 826 (2005), *cert. denied.* 391 Md. 579, 894 A.2d 546 (2006).

Finally, appellant alleges several errors in the chancellor's consideration of the eleventh, "catch-all" factor, which permits the court to consider "any other factor that the court consid-

ers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award...." F.L. § 8–205(b)(11). The court recognized that, after the separation, appellant "continued to pay the mortgage payments, taxes, repairs, appliance replacements, and the general upkeep [o]n the Kerr Avenue property." Accordingly, the court awarded appellant some contribution from appellee towards these expenses, reasoning:

> To date, the husband has paid $20,491.62 toward the mortgage of the Kerr Avenue home and the Wife has paid approximately $18,400 to rent an apartment. Because the Husband has been solely responsible for the maintenance and upkeep costs on Kerr Avenue and considering the Wife has had to pay rent in the amount of $750 per month (which at some point in time, increased to $850 per month), this court calculates an award of contribution to the Husband by subtracting the approximate amount the Wife paid in rent (23 months * $800 = $18,400) from the amount the Husband paid toward the mortgage (23 months * $890.62 = $20,491.62) and dividing that in half ($2,091.62 ÷ 2 = $1,045.81). The Court makes an award of contribution to the Husband in the amount of $1,045.81, which may be paid to him from the net proceeds of the sale of the Kerr Avenue home.

The chancellor continued:

> It is also important to reiterate that the Wife left a total of $3200 in the joint checking and savings accounts when she left. The couple agreed that the husband would take and continue to pay the balance of the Sony credit card and the Wife would take and continue to pay the balance of the MBNA credit card. The balance on the Sony card was about $2100 and the balance on the MBNA card was about $5300.

Appellant assigns error as to this factor with regard to the chancellor's calculation of appellee's rent at $800 per month. He argues:

> Aside from the fact that the rent was '$750 and going to $850,' implying it was still $750 at the time of the hearing,

there was no evidence as to if or when she actually paid $850 per month, and it was incorrect to summarily average the rent to $800 per month without any basis to support that choice.

In response, appellee notes that she testified that her rent was "$750 when I moved in. Its [sic] now up to $850."

We discern neither error nor abuse of discretion in the chancellor's decision to "approximate" appellee's rent at $800 per month, given appellee's testimony and the lack of evidence as to the exact date when appellee's rent increased from $750 to $850. Appellant could have cross-examined appellee to determine the exact date upon which her rent increased, but did not do so. The court was entitled to credit appellee's testimony and conclude that, at some point during the separation, appellee's rent increased to $850, and to use an average as the rental figure. Put another way, the chancellor's practical decision to approximate appellee's total rent on the basis of the testimony before him did not exceed the bounds of his discretion.

Appellant also takes issue with the chancellor's mention of the $3,200 that appellee left in the joint account upon separation. Appellant contends that the $3,200 was not "relevant" because the monies were marital funds used by appellant to pay marital debts. We are unable to discern error here. Among other things, the chancellor stated no conclusion that flowed from its mention of the $3,200. The chancellor's mere statement that it was "important to reiterate" that fact is, in our view, neither reversible error nor an abuse of discretion. Moreover, it was plainly relevant to the court's equitable analysis that appellant had the use of appellee's $3,200 to pay the parties' bills post-separation.

In addition, appellant challenges the chancellor's decision to take into account the cost of appellee's rent and, in effect, use that sum as a credit toward her contribution to the expenses he paid for the marital home. Appellant asserts:

[T]here was no statutory authority or case law in support of credit for rent, as it was her choice of residence and her

choice to encumber her salary in that way. Her payment of rent in no way benefitted the family unit, and in fact rendered her less able to maintain the debts for which she remains legally obligated. The contribution allegedly owed [appellant] as a result of this discussion, $1,045.81, was not correctly calculated, as the rent should not have been credited to [appellee], and his payments on the second mortgage should have been considered in his favor.

Appellee has not challenged the chancellor's decision to award contribution in this case. She urges us to uphold the ruling, claiming "the Chancellor recognized that while [appellant] made all of the mortgage payments on the marital home, he also received the benefit of living in the marital home." Citing *Broseus v. Broseus*, 82 Md.App. 183, 570 A.2d 874 (1990), appellee maintains:

> Courts have upheld the denial of contribution where, as here, [appellant] receives the benefit of the use of the residence and has not made any claim that the expenses of the house exceeded the value of the use of the premises. While the Chancellor in this case did not deny contribution entirely, he certainly did not abuse his discretion in taking those same facts into consideration for his calculation.

We begin by reviewing generally the award of contribution for expenditures toward the mortgage and upkeep of the marital home during separation.

In *Baran v. Jaskulski*, 114 Md.App. 322, 328–32, 689 A.2d 1283 (1997), we explained the origin and meaning of the term "*Crawford* credits," and presented the following definition, *id.* at 332, 689 A.2d 1283:

> Crawford Credits—the general law of contribution between cotenants of jointly owned property applies when married parties, owning property jointly, separate. A married, but separated, cotenant is, in the absence of an ouster (or its equivalent) of the nonpaying spouse, entitled to contribution for those expenses the paying spouse has paid.

The Court of Appeals considered the concept of contribution in divorce cases in the seminal case of *Crawford v. Crawford*,

293 Md. 307, 443 A.2d 599 (1982), from which the term "Crawford credits" is derived. There, the Court expounded on the "general law of contribution that applies to co-tenants . . . ." *Id.* at 309, 443 A.2d 599. It said: "Generally, one co-tenant who pays the mortgage, taxes, and other carrying charges of jointly owned property is entitled to contribution from the other." *Id.* The Court explained that the doctrine of contribution is equally applicable to a tenancy by the entireties (a form of co-tenancy available only to married couples) as to other forms of co-tenancy (tenancy in common and joint tenancy). *Id.* at 310–11, 443 A.2d 599. The Court noted, however, that "[w]hen the co-tenants are married to each other . . . a presumption of gift usually arises as to any payment made to purchase the property," *id.* at 311, 443 A.2d 599, thus defeating the payor spouse's entitlement to contribution. *See id.* at 311–14, 443 A.2d 599. The *Crawford* Court's paramount determination was that, although "the presumption of gift doctrine is alive in Maryland [when,] at the time of the transaction(s) in question, the parties are living together as husband and wife," *id.* at 314, 443 A.2d 599, the presumption does not apply when spouses have separated. In that situation, "the reason for the presumption is not present and it does not arise . . . ." *Id.*

*Caccamise v. Caccamise*, 130 Md.App. 505, 747 A.2d 221, *cert. denied,* 359 Md. 29, 753 A.2d 2 (2000), is also instructive. In that case, we explained that there are "four exceptions that preclude contribution; namely (1) ouster;[16] (2) agreements to the contrary; (3) payment from marital property; and (4) an inequitable result."[17] *Id.* at 525, 747 A.2d 221. Moreover,

---

16. " 'Ouster is the actual turning out or keeping excluded the party entitled to the possession of any real property.' Ouster has been defined by this Court . . . as: '[A] notorious and unequivocal act by which one cotenant deprives another of the right to the common and equal possession and enjoyment of the property.' " *Choate v. Choate,* 97 Md.App. 347, 368 n. 9, 629 A.2d 1304 (1993) (internal citations omitted). There has been no allegation of ouster in this case.

17. It appears that appellant made the mortgage and home equity loan payments predominantly from his employment income, which techni-

the court is " 'not obligated to award such contribution between husband and wife at the time of divorce.' " *Gordon, supra,* 174 Md.App. at 641, 923 A.2d 149 (citation omitted). *See Kline,* 85 Md.App. at 48, 581 A.2d 1300; *Broseus,* 82 Md.App. at 192, 570 A.2d 874. Rather, such an award is discretionary. *Woodson v. Saldana,* 165 Md.App. 480, 493, 885 A.2d 907 (2005).

We explained in *Kline,* 85 Md.App. at 48, 581 A.2d 1300: "The reason contribution is not mandatory between spouses at the time of divorce is that contribution is an equitable principle ... and the ability to grant a monetary award under the [Marital Property] Act enables the chancellor to achieve more complete equity than can be done through a *Crawford* contribution." Indeed, " 'requiring contribution could create the very inequity which the Act was designed to prevent.' " *Imagnu v. Wodajo,* 85 Md.App. 208, 223, 582 A.2d 590 (1990) (citation omitted). Thus, "the court must exercise its discretion to determine whether *Crawford* credits are warranted," and it is therefore not accurate to say "that 'the spouse who pays mortgage and other carrying charges that preserve the property is *entitled to* ' receive such credits in all cases." *Woodson,* 165 Md.App. at 493, 885 A.2d 907 (citing *Keys,* 93 Md.App. at 681, 614 A.2d 975) (emphasis added). As we stated in *Spessard v. Spessard,* 64 Md.App. 83, 96, 494 A.2d 701 (1985), "the test involves whether the total disposition is equitable."

 To be sure, appellant did not benefit from appellee's rental of an apartment. In contrast, appellee derived significant benefit from appellant's payment of the mortgage, because she is entitled to half of the equity in the house. Nevertheless, we do not find an abuse of discretion in the

---

cally is marital property because the parties had not yet been divorced. *See* F.L. § 8–201(e)(1) (marital property is "property, however titled, acquired by 1 or both parties during the marriage"). *See also, e.g., Alston, supra,* 331 Md. at 505 & n. 7, 629 A.2d 70. We assume the court's decision to award less than 50% contribution in this case, on the ground that appellant had use of the marital home while appellee had to rent an apartment, to be motivated by the fourth *Caccamise* factor, the avoidance of "an inequitable result."

chancellor's decision to award *Crawford* credits to appellant of less than 50% of his mortgage payments during the separation. Appellant enjoyed sole use of the marital home during that time period.[18] Moreover, he was not necessarily entitled to any contribution from appellee, much less contribution in an amount equal to half of the total mortgage payment of $20,491.62. However, the court was entitled to award contribution of less than 50% of appellant's expenditures.

In *Broseus*, 82 Md.App. at 193, 570 A.2d 874, we upheld a court's decision not to award contribution altogether, where the payor spouse "was receiving the benefit of the use of the residence and since [the non-payor spouse's] standard of living was considerably lower than his." The Court emphasized that the payor spouse made "no claim that the expenses of the house exceeded the value of use of the premises, and the record indicates no basis on which to make such an argument." *Id.*

In this case, as in *Broseus*, there was no evidence of the value of the use of the marital home. However, there was evidence of the rental value of appellee's apartment. The chancellor did not abuse his discretion in reducing the amount of contribution by the amount appellee had to expend in rent. The chancellor's order effectively required the parties to split, 50/50, both the rent and mortgage payments.[19]

---

**18.** As between co-tenants who are not married, this would not be a basis for an offset against a contribution award. The Court said in *Kline*, 85 Md.App. at 49, 581 A.2d 1300 (citing cases):

> [U]nless a co-tenant ha[s] been evicted or ousted from possession, there [is] no implied promise by the tenant who remain[s] in possession to pay the co-tenant out of possession for his use and enjoyment of the premises, nor [can] the tenant out of possession offset his obligation for contribution by the value of the benefits enjoyed by the tenant in possession.

But, the *Kline* Court went on to make clear that this limitation does not apply in the context of marital property distribution: "Under the Act ... if there is marital property to support a monetary award, the chancellor has the ability to consider all factors that give rise to principles of equity." *Id.*

**19.** This methodology would not necessarily produce an equitable result in every case. For instance, if the rental cost of the apartment were

But, the chancellor did not explain his failure to include in the calculation of the contribution award the amount appellant paid on the home equity loan during the separation. As the Court stated in *Crawford,* 293 Md. at 309, 443 A.2d 599, the general rule regarding contribution is that "one co-tenant who pays the mortgage, taxes, and other carrying charges of jointly owned property is entitled to contribution from the other." Indeed, "contribution may be demanded for any expenditures that were reasonable and necessary for the preservation and protection of the property against loss." *Kline,* 85 Md.App. at 48, 581 A.2d 1300 (1990).

Appellant's payments on the home equity loan were plainly within the ambit of expenditures that are subject to contribution. Although the chancellor has broad discretion to deny an award of contribution, he should make his decision on the basis of all of the expenses eligible for contribution. In this case, because of the absence of any explanation, we cannot discern whether the court's omission of the home equity loan from the calculations was an intentional choice based on the equities of the case, or merely an oversight. Therefore, on remand, the circuit court should reevaluate its contribution award, taking into account all contribution-eligible expenses.

## C. Attorney's Fees

Appellant also argues that the chancellor erred in his award of $2,500 in attorney's fees to appellee. The chancellor's award was based on the following analysis: "[Appellee] took a loan against one of her retirement accounts and borrowed money from her daughter in order to pay her attorney." Appellant contends:

significantly higher than the value of use of the marital home, the methodology would defeat the purpose of an award of contribution and the overall equitable goals of a monetary award. In this case, however, appellee's monthly rent payment was less than the monthly mortgage payment on the home. Given the chancellor's broad equitable discretion in awarding contribution, we do not perceive an abuse in crediting appellee with her rent payments.

Given the errors in the means of valuing and awarding a marital award in this case, the award of a part of [appellee's] fees to her was also erroneous.... [I]t is apparent from the record that the Court failed to consider the financial circumstances of the parties in full and accurate detail. For the years for which she presented income information, [appellee] earned more money than [appellant]. Furthermore, assuming *arguendo* that the parties equally divide the proceeds from the house, as ordered by the Court prior to its discussion of the marital award, she would have ample funds from which to pay her own attorney. Beyond that, as the operation of the flawed marital award would essentially and effectively award the value of all the marital property the Court actually considered to her, [appellant] would be without means to pay any fee award, even if it had been properly reviewed. With their respective incomes, and with even just half the proceeds from the house, she clearly was awarded sufficient assets from which to pay her own fees.

Because we have vacated the monetary award, the award of attorney's fees must necessarily be vacated and reconsidered on remand as well. *See, e.g., Simonds v. Simonds,* 165 Md.App. 591, 608, 886 A.2d 158 (2005). Nevertheless, we shall discuss this issue for the benefit of the chancellor and the parties on remand.

F.L. § 8–214 provides for an award of "reasonable and necessary expenses," including suit money, counsel fees, and costs, in proceedings for disposition of marital property. We quote the provision:

**§ 8–214. Award of reasonable and necessary expenses.**

(a) *Definition.*—In this section, "reasonable and necessary expense" includes:

(1) suit money;

(2) counsel fees; and

(3) costs.

(b) *Award authorized.*—At any point in a proceeding under this subtitle, the court may order either party to pay to the

other party an amount for the reasonable and necessary expense of prosecuting or defending the proceeding.

(c) *Considerations by court.*—Before ordering the payment, the court shall consider:

 (1) the financial resources and financial needs of both parties; and

 (2) whether there was substantial justification for prosecuting or defending the proceeding.

(d) *Lack of substantial justification and good cause.*— Upon a finding by the court that there was an absence of substantial justification of a party for prosecuting or defending the proceeding, and absent a finding by the court of good cause to the contrary, the court shall award to the other party the reasonable and necessary expense of prosecuting or defending the proceeding. . . .

In *Doser v. Doser*, 106 Md.App. 329, 664 A.2d 453 (1995), we explained that " 'justification,' for the purposes of [the family law fee-shifting statutes] is not equivalent to 'success;' even if [a party] did not receive the [relief] she requested, her loss would not preclude an award of counsel fees." *Id.* at 359, 664 A.2d 453. Rather, the focus is on the relative "financial resources and financial needs" of the parties, and "whether there was substantial justification for prosecuting or defending the proceeding." F.L. § 8–214(c).

In *Collins v. Collins*, 144 Md.App. 395, 798 A.2d 1155 (2002), we reviewed the award of attorneys' fees, noting that such an award rests " 'solely in the discretion of the trial judge.' " *Id.* at 447, 798 A.2d 1155 (citation omitted). There, the trial court made reference to the conduct of the parties, whether the parties' positions were justified, and their ability to pay. *See id.* at 445–46, 448, 798 A.2d 1155. We vacated the award, however, and remanded for further proceedings as to whether the fees were reasonable, stating: "[S]ome express discussion regarding the reasonableness of the fees in light of such factors as labor, skill, time, and benefit received is necessary." *Id.* at 449, 798 A.2d 1155.

■ In this case, as in *Collins*, there was no discussion of the reasonableness of the attorney's fees charged. Moreover, the court made no express findings as to which, if any, of the legal actions of appellant were not substantially justified, and what proportion of the attorney's fees were attributable to those unjustified positions. Most important, the court made no findings at all as to appellant's financial ability to pay the attorney's fees, or appellee's financial resources. We also agree with appellant that, in evaluating the parties' financial positions, the court must take into account any monetary award.

**JUDGMENT OF ABSOLUTE DIVORCE AFFIRMED. JUDGMENT VACATED WITH RESPECT TO MONETARY AWARD, AWARD OF CONTRIBUTION, AND ATTORNEY'S FEES. CASE REMANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 75% BY APPELLEE, 25% BY APPELLANT.**